## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LANA M. PAAVOLA, individually, and as Administrator of the ESTATE OF JOEL D. PAAVOLA, deceased**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES OF AMERICA, DISTRICT OF COLUMBIA, and HOPE VILLAGE, INC.,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case: 1:19–cv–01608  JURY DEMAND<br>Assigned To : Bates, John D.<br>Assign. Date : 6/3/2019<br>Description: Personal Injury (B–DECK)<br><br>**Jury Demand** |

## COMPLAINT

Plaintiffs Lana Paavola, individually, on her own behalf; as Administrator of the Estate of Joel D. Paavola; and on behalf of the wrongful death beneficiaries of Joel D. Paavola, brings this action seeking all available damages arising from the wrongful death of her husband, Joel Paavola, on June 4, 2018 and alleges as follows:

## NATURE OF ACTION

1.  This is a wrongful death and/or survival action for all recoverable compensatory and punitive damages against Defendants (1) the United States of America, (2) the District of Columbia and (3) Hope Village, Inc.   The Defendants, by virtue of their negligent acts and/or omissions, directly and proximately caused the premature and wrongful death of Joel D. Paavola.   Due to Mr. Paavola's murder, Lana Paavola, individually, and the children of Mr. and Ms. Paavola, have experienced significant damages, including medical expenses, loss of earned income, loss of services, and loss of consortium.  Joel Paavola experienced pain and suffering prior to his wrongful death.

2. This is also a breach of contract action, as Plaintiffs were third-party beneficiaries of contracts in place amongst the Defendants governing pretrial detainees.

3. As alleged in greater detail below, Defendants permitted and maintained a culture of lax detention and supervision of pretrial detainees, permitting detainees to voluntarily leave custody. In many cases, Defendants erroneously released pretrial detainees. These actions threatened the safety of the public and led to direct harm.

4. Defendants negligently permitted Domenic Micheli to leave custody of Hope Village, and/or failed to notify the appropriate parties of his departure, permitting Mr. Micheli to travel freely, causing the vicious murder of Mr. Paavola. Defendants' errors in Mr. Micheli's detention were part of a lengthy pattern by the Defendants of negligently managing pretrial detainees in their custody and in negligently failing to take required action to remedy years of shortcomings. Prior to 2018, Defendants were on notice of this history, but failed to take action, proximately causing Mr. Paavola's murder.

## PARTIES, VENUE AND JURISDICTION

5. Plaintiff, Lana M. Paavola, is an adult resident of Williamson County, Franklin, Tennessee. She lived in Franklin, Tennessee at the time of the events in this lawsuit. At the time of filing of this lawsuit, Ms. Paavola is a current resident of Williamson County, Franklin, Tennessee. On July 16, 2018, Ms. Paavola was appointed as the administrator of the Estate of Joel David Paavola (see Exhibit A to the Complaint).

6. Joel Paavola was murdered on June 4, 2018 due to Defendants' negligence. Prior to Mr. Paavola's murder, Mr. and Ms. Paavola had been married for 18 years. Mr. Paavola was the father of five (5) children. Mr. Paavola's murder occurred at "The

Balance," a fitness facility operated by Mr. Paavola, located in Nashville. At the time of his death, Mr. Paavola was a Tennessee resident, living with Ms. Paavola.

7. The acts or omissions complained of occurred in part in Washington, D.C.

8. The United States of America is a Defendant due to the actions and/or omissions of the Court Services and Offender Supervision Agency (CSOSA) and/or the Pretrial Services Agency (PSA). These independent federal agencies are charged, under 18 U.S.C.A. §3154, with supervision of detention of certain pretrial criminal defendants in the District of Columbia while arrestees await trial in the U.S. District Court. Presuit notice, as required by the Federal Tort Claims Act (FTCA) was mailed to the Office of General Counsel for the CSOSA at 633 Indiana Avenue Northwest, Washington, D.C. 20004 on September 26, 2018. A certified mail return receipt was signed by the Office of General Counsel on October 2, 2018. The CSOSA denied Plaintiffs' claim on April 22, 2019 "after careful consideration of the claim and the various supporting documents provided to the Agency." The CSOSA Case # is 2019352 (Exhibit B). By waiting to file this suit until after the claim was denied by the CSOSA, Plaintiffs exhausted their administrative remedies against the CSOSA as required by the FTCA. Suit was also filed within six (6) months of the agency's denial, as required by law.

9. The District of Columbia ("D.C.") is the capital of the United States of America. The District of Columbia oversees the D.C. Department of Corrections, a correctional agency responsible for the adult jails and other adult correctional institutions in the District of Columbia. The D.C. Department of Corrections contracts with the federal government to detain persons arrested in D.C. on certain federal charges while those persons await trial in the U.S. District Court for the District of Columbia. The District of

3

Columbia received timely notice of this action, as required by DC St. §12-309. The District of Columbia was provided with notification on September 26, 2018 at the (1) Office of the Secretary, John A. Wilson Building, 1350 Pennsylvania Avenue N.W., Suite 419 Washington, D.C. 20004, and the (2) Office of the Attorney General for the District of Columbia, 441 4th Street N.W., Room 600-South, Washington, D.C. 20001. The District of Columbia acknowledged receipt of presuit notice on October 10, 2018.[1]

10. Hope Village, Inc. is a private, for profit entity that owns, leases, operates, and/or manages a halfway house facility at 2840 Langston Place, S.E., Washington, D.C. 20020.  Hope Village, Inc. is a resident of the District of Columbia.  Hope Village, Inc. contracted with the D.C. Department of Corrections, the CSOSA, and/or the United States government to provide halfway house services to criminal offenders in the District of Columbia.  Mr. Micheli was in the custody of Hope Village in May 2018. Hope Village's registered agent is the C.T. Corporation System, and Hope Village may be served with process at 1015 15th St. NW, Suite 1000, Washington D.C., 20005.

11. This Court has subject matter jurisdiction over the claims against the United States pursuant to 28 U.S.C. §1331 and 28 U.S.C §2674. The Court has supplemental subject matter jurisdiction over the claims against the District of Columbia and Hope Village pursuant to 28 U.S.C. §1367.  This Court may exercise personal jurisdiction over the Defendants, all of whom transact business in the District of Columbia; own, use or have an interest in real property in the District of Columbia; and caused tortious injuries by acts or omissions occurring in the District of Columbia, as alleged in this Complaint.

12. Venue is proper under 28 U.S.C. §1391(b)(1) or (b)(2).  The acts or omissions by Defendants that caused Mr. Paavola's death occurred in the District of Columbia.

---

[1] Exhibit C.

4

## FACTS

13. Prior to April 2018, the Defendants collectively oversaw and were responsible for multiple inexcusable failures in the management, supervision, and detention of pretrial arrestees. These failures led to premature releases and/or failed efforts to apprehend detainees that should have been detained, leading to harm to the public.

14. For example, according to a Complaint filed in *Carol Smith v. Hope Village, Inc.* (Case No. 1:05CV00633, U.S. District Court for D.C.), Hope Village negligently released detainee Anthony Kelly in 2002. After his improper release, Mr. Kelly broke into a nearby home and murdered a nine-year old girl, E. S. E.S.'s mother filed a lawsuit. Hope Village and the Defendants were put on notice in the *Smith* case that injuries to others from the negligent release of someone in their custody were foreseeable.[2]

15. In the years before this incident, federal prison records show approximately 1,100 inmates nationwide failed to return at scheduled times, or at all, to federal halfway houses in the United States. Federal authorities consider the failure to return an escape, or walkaway. Hope Village accounted for about 10% of those cases in 2016 and 2017, though it only accounted for 3% of the federal halfway house population.

16. According to the Washington Post, *in the month prior* to the events at issue in this lawsuit, a United States District Judge "castigated" the Defendants for a half-dozen erroneous inmate releases, and a high-profile mix-up involving an attempted murderer.

17. The Defendants knew of the serial lapses described in Paragraphs 13 - 16, but took no steps to prevent repetition of those errors, endangering the public at large, and specifically, endangering Joel Paavola, Mr. Micheli's former employer.

---

[2] *Smith v. Hope Vill., Inc.*, 481 F. Supp. 2d 172 (D.D.C. 2007).

18. From 2012 to 2017, Domenic Micheli worked for Joel Paavola at The Balance, a fitness facility in Tennessee. Mr. Paavola fired Mr. Micheli in 2017.

19. On April 27, 2018, Mr. Micheli was arrested for trespassing at the White House in Washington, D.C. Mr. Micheli was detained in a D.C. jail until May 1, 2018.

20. After four (4) nights of incarceration, the initial appearance and arraignment occurred on May 1, 2018. Mr. Micheli appeared in person. Mr. Micheli claimed to be President, in town to lead the nation. He disclosed prior mental health care in Nashville. The United States sought detention of Mr. Micheli as a serious flight risk based on his statements to the Secret Service. A detention hearing was set for May 2, 2018.

21. On May 2, 2018, the Honorable G. Michael Harvey, U.S. Magistrate Judge, entered a Release Order, which stated "The D.C. Department of Corrections is Directed to Notify the Court Immediately by FAX of Defendant's Escape or Remand to the D.C. Jail. This Notification shall be Faxed to the Attention of the Criminal Clerk's Office (FAX # 535-0320) and will Be Forwarded to the Appropriate Judicial Officer."

22. Mr. Micheli was released to the third party custody of the D.C. Department of Corrections for placement in a halfway house. The terms of this release were governed, in part, by contracts between the United States of America and the D.C. Department of Corrections. The contracts required notification of an escape. The D.C. Department of Corrections was required to "immediately notify the Federal Government of an escape of a federal detainee," and to use "all reasonable means to apprehend the escaped federal detainee."  The D.C. Department of Corrections was also required to immediately notify the U.S. District Court for D.C. if Mr. Micheli did not comply with the terms of his release, including any efforts by Mr. Micheli to escape or abscond.

6

23. The terms of the Release also required the Pretrial Services Agency (PSA) to monitor Mr. Micheli to ensure compliance with the terms of his release and to ensure appearance at future hearings.  Federal law, codified at 18 U.S.C. 3154, required the PSA to inform "the Court and the United States Attorney of all apparent violations of pretrial release condition," and "any danger that any such person may come to pose to any other person or the community."  PSA failed to comply with this statutory mandate.

24. On May 9, 2018, Mr. Micheli underwent a mental competency evaluation.  The examiner documented that Mr. Micheli provided irrational information.  The exam was concerning, and a follow-up exam was scheduled. The Defendants were aware of, or should have been aware of, the results of the May 9th examination.

25. On May 15, 2018, Mr. Micheli checked into Hope Village halfway house, as required by the terms of the Release Order issued by the U.S. Magistrate Judge.

26. Another hearing was held on May 18, 2018 before United States District Judge Paul Friedman. Melvin Tildon from Pretrial Services attended the hearing.  Mr. Tildon reported that Mr. Micheli arrived at Hope Village on May 15, 2018. A mental health assessment, with equivocal results, occurred on the morning of May 18, 2018.  Another assessment with the "Department of Behavioral Health" was set for Monday, May 21, 2018.  The matter was set for status conference or plea on June 14, 2018.

27. After May 18, 2018, Mr. Micheli failed to comply with the terms of his confinement at Hope Village.  Hope Village, which was bound by a Statement of Work or contract it agreed to, failed to timely notify the appropriate authorities, including the PSA and the D.C. Department of Corrections (and others identified in the applicable contracts and statutes), of Mr. Micheli's conduct, escape, or "absconded" status.  The PSA, which had

7

an independent oversight duty over Mr. Micheli, also failed to notify the appropriate authorities of Mr. Micheli's failure to comply with the terms of his release.  Despite having knowledge of Mr. Micheli's actions, the Defendants failed to take any steps to ensure that Mr. Micheli was apprehended before he would harm the Plaintiffs.

28. Prior to Mr. Micheli's escape from Hope Village, Mr. Micheli's family and friends warned the Defendants that Mr. Micheli was an escape risk and was dangerous.  The Defendants were warned that Mr. Micheli might injure someone if not detained.  It was foreseeable that one of the persons injured might be Joel Paavola.

29. After his escape from Hope Village, but before he murdered Mr. Paavola on June 4, Mr. Micheli posted a series of bizarre and deeply concerning messages on Facebook. For example, on May 26, 2018, Mr. Micheli claimed to be the "Sun of God" and warned that "there will not be any mercy doled out after this post."  He boasted he could "kill nine tenths of the worlds [sic] population and be within justice."  He threatened to "...keep going until everyone is drooling but me."  Using these posts, law enforcement could have located and apprehended Mr. Micheli before he murdered Joel Paavola.

30. In advance of June 4, 2018, the D.C. Department of Corrections became aware that Mr. Micheli was not complying with the terms of the Release Order.  The D.C. Department of Corrections failed to timely notify and/or failed to ever notify the appropriate parties' of Mr. Micheli's actions, and failed to take any steps to ensure that Mr. Micheli was apprehended before he could harm the Plaintiffs.  Instead of performing the required notifications or taking the required steps to capture Mr. Micheli, D.C. employees performed other tasks, some of which were personal in nature.

8

31. On June 4, 2018, Mr. Micheli entered the premises at The Balance in Nashville and viciously attacked Joel Paavola using a meat cleaver and a tomahawk.

32. Striking with both the meat cleaver and the tomahawk, Mr. Micheli inflicted a series of multiple sharp and blunt force injuries:

      a) Three (3) chop injuries to the rear of Mr. Paavola's head, measuring 5 ¼ inches by ¾ inches.

      b) Three (3) chop fractures of the occipital bone of Mr. Paavola's skull with bony fragmentation, and penetration into the left occipital lobe of Mr. Paavola's brain.

      c) Fractures of the occipital, left temporal, left parietal, right ring of the sphenoid, frontal and right temporal bones of Mr. Paavola's skull.

      d) Sharp wound to the left chin.

      e) Traumatic fracture of the mandible, and the left upper incisor.

      f) A sharp wound to the bridge of the nose.

      g) A penetrating, sharp wound to the left forehead.

      h) Penetrating and perforating stab wounds to the left upper chest.

      i) Penetrating stab wound to the right shoulder.

      j) Penetrating stab wound to the right lower abdomen.

      k) A sharp wound to the right lower chest.

      l) An incised wound to the right abdomen.

      m) Seven (7) wounds to Mr. Paavola's back, covering 10 square inches.

      n) Penetrating chop wound of the lateral aspect of Mr. Paavola's left foot fracturing the fifth tarsal bone.

o) Penetrating chop wound of the right hand distal to the anterior wrist crease, 9 ½ inches in length.

p) Fractures of the right wrist and fractures of the 2nd, 3rd and 4th carpal bones of Mr. Paavola's right hand.

q) Penetrating chop wound of the left hand, with a fracture of the 1st carpal bone of the left hand.

r) Multiple penetrating chop wounds of the palmar surface of the left hand, with incised wounds across the bases of left fingers 2, 3, 4 and 5.

s) Fractures of the proximal phalanges of left fingers 4 and 5, and a fracture of the proximal phalange of the left 5th finger.

t) Incised wounds to the back of the left finger, the palmer surface of the left 4th finger, the medial aspect of the left wrist, the right thigh, the left ankle, the anterior right arm, and the anterior right axilla.

33. Mr. Paavola was attacked at 0648. He died at 0724. Mr. Paavola was alive for nearly thirty-six (36) minutes after the devastating attack by Mr. Micheli.

34. Mr. Paavola succumbed to the devastating injuries to his skull and brain on June 4, 2018. Mr. Paavola's death could have been prevented but for the actions and/or inactions of Hope Village, the United States, and the District of Columbia.

35. Ms. Paavola is now a widowed mother of five (5) children.

## **CAUSES OF ACTIONS**

### **COUNT ONE – NEGLIGENCE / RECKLESSNESS BY THE DISTRICT OF COLUMBIA / THE D.C. DEPARTMENT OF CORRECTIONS**

36. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 35.

37. Plaintiffs bring a survival action against the District of Columbia and the D.C. Department of Corrections pursuant to D.C. Code §12–101 and/or a wrongful death action against the District of Columbia and the D.C. DOC pursuant to D.C. Code §16–2701. In the alternative, because the injury to Mr. Paavola occurred in Tennessee, Plaintiffs bring a wrongful death action under Tenn. Code Ann. §20-5-101, *et. seq.*

38. Prior to April 27, 2018, District of Columbia was negligent and reckless by not taking steps, or by taking affirmative steps instead of the required steps, to protect Mr. Paavola by correcting the errors and mistakes identified in Paragraphs 13 - 17.

39. In May and June 2018, the District of Columbia owed a duty to the public and to the Plaintiffs, specifically:

   a) to appropriately monitor, supervise, and secure pretrial detainees in its custody while the detainees awaited trial;

   b) to prevent negligent release of detainees within its custody and control;

   c) to take appropriate and/or mandatory steps to notify appropriate authorities when a detainee failed to comply with the terms of his confinement and/or escaped from confinement and/or was inappropriately released from confinement, as had occurred many times before;

   d) to take appropriate steps to recapture escaped inmates;

   e) to take appropriate action to remedy serial and continued lapses in oversight and management of the pretrial detention services it provided;

    f)  to follow applicable internal policies and procedures;

    g)  to comply with the terms of all contracts between it and other public and private organizations responsible for pretrial detention of arrestees;

    h)  to comply with the requirements of all applicable statutes, rules, and regulations governing pretrial detention of arrestees in its custody; and

    i)  to protect the community at large from bodily harm done by criminal offenders within its custody.

40. The District of Columbia also had a duty to make sure the parties with whom it contracted to detain persons within its custody complied with (a) the duties identified in Paragraph 39, (b) all applicable contracts (such as the Intergovernmental Agreement and/or the Statement of Work), and (c) all applicable laws, regulations, and standards.

41. The District of Columbia voluntarily accepted the duties identified in Paragraphs 39 - 40 and profited by agreeing to perform them. The District knew detainees in its custody, including Mr. Micheli, were dangerous to the public and Plaintiffs. Despite these obligations, the District failed to comply with its duties in Paragraphs 39 - 40.

42. The District's conduct in supervision of Mr. Micheli was reckless. The District intentionally or consciously ran very serious risks with no good reason to do so. Due to the history identified in Paragraphs 13 – 17 and the knowledge possessed by the District, as identified in Paragraphs 28 and 43, the District knew of, but consciously disregarded, a substantial and unjustifiable risk that constituted a gross deviation from the standard of care that an ordinary person would exercise in all circumstances.

43. The District of Columbia knew that Mr. Micheli posed a threat to the Plaintiffs because of his mental health history and information provided by Mr. Micheli's family.

44. The District breached the duties identified in Paragraphs 39 - 40 in its management of Mr. Micheli's confinement.  This breach was the actual and proximate cause of Mr. Paavola's injuries and death on June 4, 2018 in Nashville, Tennessee.  But for the breach of duty by the District, Mr. Micheli would have remained in confinement in the District of Columbia and/or would have been apprehended prior to June 4, 2018.

45. Because of the District of Columbia's actions and/or inactions, Mr. Paavola suffered devastating injuries and bled to death after the lethal attack on June 4, 2018.

46. It is foreseeable that detainees within the custody and control of the Defendant are likely to cause bodily harm to members of the public and Plaintiffs if not properly controlled.  Bodily harm was foreseeable in this case because of information the Defendant had about Mr. Micheli, from mental evaluations and from family and friends.

47. The District of Columbia is jointly and severally liable for Plaintiffs' injuries.

## COUNT TWO – NEGLIGENT SUPERVISION AND TRAINING BY THE DISTRICT OF COLUMBIA / THE D.C. DEPARTMENT OF CORRECTIONS

48. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 47.

49. In May and June 2018, the District of Columbia had a duty to train its employees to appropriately manage and supervise detainees within its custody.

50. The District of Columbia also had a duty to supervise the parties with whom it contracted to ensure that the persons with whom it contracted detained persons within its custody complied with (a) the duties identified in Paragraph 39, (b) all applicable contracts (such as the Intergovernmental Agreement and/or the Statement of Work), and (c) all applicable laws, regulations, and standards.

51. The District breached its duties by not training its employees to manage inmate detention appropriately, to report escapes, and/or to recapture escaped inmates.

52. This breach was the actual and proximate cause of Mr. Paavola's injuries and death on June 4, 2018 in Nashville, Tennessee.  But for the breach of duty by the District, Mr. Micheli would have remained in confinement in the District of Columbia and/or would have been apprehended prior to June 4, 2018.

53. Because of the District of Columbia's actions and/or inactions, Mr. Paavola suffered devastating injuries and bled to death after the lethal attack on June 4, 2018.

54. It is foreseeable that detainees within the custody and control of the Defendant are likely to cause bodily harm to members of the public and Plaintiffs if not properly controlled.  Bodily harm was foreseeable in this case because of information the Defendant had about Mr. Micheli, from mental evaluations and from family and friends.

55. The District's training and supervision was negligent and reckless.  The District intentionally or consciously ran very serious risks with no good reason to do so.

56. The District of Columbia is jointly and severally liable for Plaintiffs' injuries.

### COUNT THREE – STATE ENDANGERMENT AND/OR DELIBERATE INDIFFERENCE BY THE DISTRICT OF COLUMBIA / THE D.C. DEPARTMENT OF CORRECTIONS

57. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 56.

58. Plaintiffs have a substantive due process right to protection by the District of Columbia from third-party violence because District of Columbia officials affirmatively acted to increase or create the danger that resulted in the Plaintiffs' injuries.

59. Despite the history outlined in Paragraphs 13 - 17, the District took affirmative actions to cut funding and staffing for detention of inmates.  The District enacted policies

that were unsafe and entered into contracts that placed the Plaintiffs (and the public) in danger.   This affirmative conduct, which was extreme and outrageous given the importance of inmate detention, increased and/or created danger resulting in harm to Plaintiffs. But for this conduct, Mr. Micheli would not have murdered Mr. Paavola.

60. The District knew that its actions would violate the Plaintiffs' constitutional rights.

### COUNT FOUR – INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS BY THE DISTRICT OF COLUMBIA / THE D.C. DEPARTMENT OF CORRECTIONS

61. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 60.

62. The District's Conduct outlined in Paragraphs 13 – 17, Paragraph 30, and Paragraphs 39 – 40 is extreme and outrageous conduct.   In fact, judges, the news media, and the public have uniformly declared Defendants' conduct to be outrageous.[3]

63. The District, as outlined in outlined in Paragraphs 13 – 17, Paragraph 30, and Paragraphs 39 – 40, acted recklessly and/or with deliberate indifference to the problems and to the potential consequences to the public and to the Plaintiffs of its actions.

64. The conduct outlined in Paragraphs 53 and 54 caused the Plaintiffs severe emotional distress, both while Mr. Paavola bled to death and since Mr. Paavola's death.

65. Ms. Paavola suffered a serious mental injury, for which she receives counseling.

### COUNT FIVE – NEGLIGENCE / RECKLESSNESS BY THE UNITED STATES OF AMERICA

66. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 35.

67. Plaintiffs bring a survival action against the United States due to conduct by the Pretrial Services Agency and the CSOSA, pursuant to D.C. Code §12–101 and/or a

---

[3] Exhibit D.

wrongful death action against the United States and the Pretrial Services Agency pursuant to D.C. Code §16–2701. In the alternative, Plaintiffs bring a wrongful death action against the United States of America under Tenn. Code Ann. §20-5-101, *et. seq.*

68. Prior to April 27, 2018, the United States was negligent and/or reckless by not taking steps to protect the public by correcting the errors and mistakes identified in Paragraphs 13-17.

69. In May and June 2018, the United States and the PSA owed a duty to the Plaintiffs:

  a) to appropriately monitor, supervise, and secure pretrial detainees in its custody while the detainees awaited trial;

  b) to train its employees to appropriately manage and supervise detainees within its custody;

  c) to prevent negligent release of detainees within its custody and control;

  d) to take appropriate steps to recapture escaped inmates;

  e) to take appropriate and/or mandatory steps to notify appropriate authorities when a detainee failed to comply with the terms of his confinement and/or escaped from confinement;

  f) to take appropriate action to remedy serial and continued lapses in oversight and management of the pretrial detention services it provided;

  g) to follow applicable internal policies and procedures;

  h) to comply with the terms of all contracts between it and other public and private organizations responsible for pretrial detention of arrestees;

        i)   to comply with the requirements of all applicable statutes, rules, and regulations governing pretrial detention of arrestees in its custody, including but not limited to 18 USC §1354(5); and

        j)   to protect the community at large from bodily harm done by criminal offenders within its custody.

70. The United States also had a duty to make sure the parties with whom it contracted to detain persons within its custody complied with (a) the duties identified in Paragraph 69, (b) all applicable contracts (such as the Intergovernmental Agreement and/or the Statement of Work), and (c) all applicable laws, regulations and standards.

71. The United States failed to comply with its duties in Paragraphs 69 - 70.

72. The United States knew, or should have known based on available information, that detainees in its custody, including Mr. Micheli, were dangerous to the Plaintiffs.

73. The United States' conduct was reckless.  The United States intentionally or consciously ran very serious risks with no good reason to do so.  Due to the history identified in Paragraphs 13 – 17 and the knowledge possessed by the United States, as identified in Paragraph 72, the United States knew of, but consciously disregarded, a substantial and unjustifiable risk that constituted a gross deviation from the standard of care that an ordinary person would exercise in all circumstances.

74. The United States breached the duties identified in Paragraphs 69 - 70 in its management of Mr. Micheli's confinement.  This breach was the actual and proximate cause of Mr. Paavola's injuries and death on June 4, 2018 in Nashville, Tennessee.  But for the United States' breaches, Mr. Micheli would have remained in confinement in the District of Columbia and/or would have been apprehended prior to June 4, 2018.

75. Because of the United States' actions and/or inactions, Mr. Paavola suffered devastating injuries and bled to death after the lethal attack on June 4, 2018.

76. It is foreseeable that detainees within the custody and control of the Defendant are likely to cause bodily harm to members of the public if not properly controlled. Bodily harm was foreseeable in this case because of information the Defendant had about Mr. Micheli, both from mental evaluations and from his family and friends.

77. The United States is jointly and severally liable for Plaintiffs' injuries.


### COUNT SIX – NEGLIGENCE / RECKLESSNESS BY HOPE VILLAGE

78. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 35.

79. Plaintiffs bring a survival action against Hope Village pursuant to D.C. Code §12–101 and/or a wrongful death action against Hope Village pursuant to D.C. Code §16–2701. In the alternative Plaintiffs bring a wrongful death action against Hope Village under Tenn. Code Ann. §20-5-101, *et. seq.* because the injury occurred in Tennessee.

80. Prior to April 27, 2018, Hope Village was negligent and reckless by not taking steps to protect the public by correcting the errors and mistakes identified in Paragraphs 13-17.

81. In May and June 2018, Hope Village owed a duty to the public and to Plaintiffs:

   a) to appropriately monitor, supervise, and secure pretrial detainees in its custody while the detainees awaited trial;

   b) to train its employees to appropriately manage and supervise detainees within its custody;

   c) to prevent negligent release of detainees within its custody and control;

d) to take appropriate and/or mandatory steps to notify appropriate authorities when a detainee failed to comply with the terms of his confinement and/or escaped from confinement;

e) to take appropriate steps to capture escaped inmates;

f) to take appropriate action to remedy serial and continued lapses in oversight and management of the pretrial detention services it provided;

g) to follow applicable internal policies and procedures;

h) to comply with the terms of all contracts between it and other public and private organizations responsible for pretrial detention of arrestees;

i) to comply with the requirements of all applicable statutes, rules, and regulations governing pretrial detention of arrestees in its custody; and

j) to protect the community at large and offenders from bodily harm done by criminal offenders within its custody.

82. Hope Village was a party to contracts that included contractual obligations:

a) to immediately notify the appropriate parties if resident failed to return to the Residential Reentry Center on time;

b) to be able to "locate and verify the whereabouts of residents at all times;"

c) to attempt to locate a resident after an escape;

d) to report an escape, immediately, by phone to the appropriate parties;

e) to capture all pertinent details of an escape in a report; and

f) to follow policies and procedures for reporting to the supervising authority.

83. Hope Village was also responsible for complying with applicable standards establishing the duty of care for a halfway house, including, but not limited to:

a) to control access to and egress from the facility;

b) to maintain continuous accountability of all detainees;

c) to maintain a system of accountability for offenders assigned to work and educational release, furloughs, and other temporary absences from the facility and to maintain a system for physically counting offenders, with at least three offender counts daily;

d) to promptly detect and promptly report absconders (timely notification is made to the facility with jurisdiction over the offender and others).

84. Hope Village voluntarily accepted the duties identified in Paragraphs 80 - 82 and profited by agreeing to perform them.  Hope Village knew or should have known based on the information available to it that detainees in its custody, including Mr. Micheli, were dangerous to the public and must be supervised.  Despite willingly accepting these obligations, Hope Village failed to comply with its duties in Paragraphs 81 - 83.

85. Hope Village breached the duties identified in Paragraphs 81 – 83 in its management of Mr. Micheli's confinement.  These breaches were the actual and proximate cause of Mr. Paavola's injuries and death on June 4, 2018 in Nashville, Tennessee.  But for the Hope Village's breaches, Mr. Micheli would have remained in confinement in D.C. and/or would have been apprehended prior to June 4, 2018.

86. Because of Hope Village's actions and/or inactions, Mr. Paavola suffered devastating injuries and bled to death after the lethal attack on June 4, 2018.

87. It is foreseeable that detainees within the custody and control of the Defendant are likely to cause bodily harm to members of the public if not properly controlled.

Bodily harm was foreseeable in this case because of information the Defendant had about Mr. Micheli, both from mental evaluations and from his family and friends.

88. Hope Village is jointly and severally liable for Plaintiffs' injuries.

## COUNT SEVEN – NEGLIGENT SUPERVISION AND TRAINING BY HOPE VILLAGE

89. Plaintiffs incorporate all allegations stated in Paragraphs 1 - 35 and 77 – 88.

90. In May and June 2018, Hope Village had a duty to train its employees to appropriately manage and supervise detainees within its custody.

91. Hope Village also had a duty to supervise the parties with whom it contracted to ensure that the persons with whom it contracted detained persons within its custody complied with (a) the duties identified in Paragraphs 81 - 83, (b) all applicable contracts, and (c) all applicable laws, regulations, and standards.

92. Hope Village breached its duties by not training its employees to manage inmate detention appropriately, to report escapes, and/or to recapture escaped inmates.

93. This breach was the actual and proximate cause of Mr. Paavola's injuries and death on June 4, 2018 in Nashville, Tennessee.  But for the breach of duty by the Hope Village, Mr. Micheli would have remained in confinement in the District of Columbia and/or would have been apprehended prior to June 4, 2018.

94. Because of Hope Village's actions and/or inactions, Mr. Paavola suffered devastating injuries and bled to death after the lethal attack on June 4, 2018.

95. It is foreseeable that detainees within the custody and control of the Defendant are likely to cause bodily harm to members of the public if not properly controlled.

Bodily harm was foreseeable in this case because of information the Defendant had about Mr. Micheli, both from mental evaluations and from his family and friends.

96. Hope Village's training and supervision was negligent and reckless.   Hope Village intentionally or consciously ran very serious risks with no good reason to do so.

97. Hope Village is jointly and severally liable for Plaintiffs' injuries.

## COUNT EIGHT – INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS BY HOPE VILLAGE

98. Plaintiffs incorporate all allegations stated in Paragraphs 1 – 35 and 78 - 88.

99. Hope Village's Conduct outlined in Paragraphs 13 – 17 and Paragraphs 81 - 83, is extreme and outrageous conduct.  In fact, judges, the news media, and the public have uniformly declared Defendants' conduct to be outrageous.[4]

100.      Hope Village, as outlined in outlined in Paragraphs 13 – 17 and Paragraphs 81 – 83 acted recklessly and/or with deliberate indifference to the problems and to the potential consequences to the public and to the Plaintiffs of its actions.

101.      The conduct outlined in Paragraphs 81 – 83 caused the Plaintiffs severe emotional distress, both while Mr. Paavola bled to death and since Mr. Paavola's death.

102.      Ms. Paavola suffered a serious mental injury, for which she receives counseling.

## COUNT NINE AGAINST ALL DEFENDANTS – BREACH OF CONTRACT / THIRD-PARTY BENEFICIARY CLAIM

103.      Plaintiffs incorporate all allegations stated in Paragraphs 1 – 101.

104.      Mr. Micheli was confined at Hope Village in May 2018, in part, pursuant to written contracts entered into (1) between the United States and the District of

---

[4] Exhibit D.

Columbia, (2) the District of Columbia and Hope Village, and (3) the United States and Hope Village.

105.      These contracts were entered into to protect the public, and the Plaintiffs, and contained specific provisions and requirements to ensure that the public was protected from inadequate supervision of pretrial detainees, premature release, and/or failure to take the appropriate steps to apprehend pretrial detainees who did not comply with court orders.

106.      The Plaintiffs and Mr. Paavola were members of the public who were third-party beneficiaries of these contracts.   The Defendants' individual and collective failure to adhere to the terms of the contracts identified in this Complaint breached the contracts.   Plaintiffs were significantly damaged from Defendants' breach, including but not limited to Mr. Paavola's injuries, Mr. Paavola's pain and suffering prior to death, Mr. Paavola's death, all economic damages (medical expenses, loss of future earnings, loss of support and services), and non-economic damages (loss of consortium) of the estate.

## DAMAGES

107.      Due to Defendants' negligence and/or breach of contract, Plaintiffs have suffered extraordinary, devastating, and permanent damages.   Mr. Paavola suffered violent injuries and unimaginable pain and suffering from the time of the attack until the time of death.   Mr. Paavola lost his life on June 4, 2018 due to Defendants' collective action.   Mr. Paavola's estate lost millions of dollars in future earnings and lost financial support and services. Ms. Paavola lost her husband. The Paavola children lost their father.

108.     Plaintiffs seek all damages recoverable by law against the Defendants, such as economic damages - including medical expenses, business expenses, lost wages, lost support and services contributions, and lost cumulative earnings - and noneconomic damages - including loss of consortium, pain and suffering, and mental anguish.

109.     Against Hope Village and the District, Plaintiffs seek punitive damages. Clear and convincing evidence demonstrates that Hope Village's conduct was reckless. Punitive damages are appropriate to ensure this does not happen again.

110.     Plaintiffs demand $30,000,000.00 in damages from the joint and severally liable Defendants.  Because the claim against the United States is limited to the amount sought during the administrative process via presuit notice, the maximum damages sought by Plaintiffs from the United States is $10,000,000.00 (or their pro rata (1/3) portion of the $30,000,000.00 global demand sought from all Defendants).

111.     In the event Tennessee law controls, Plaintiffs allege that the applicable damage restrictions, codified at Tenn. Code Ann. §29-39-101, 102, and 104 are unconstitutional.


**REQUEST FOR TRIAL BY JURY**

112.     Plaintiffs demand a jury to hear the claims against the District of Columbia and Hope Village, and that this Court use the jury as an "advisory jury" to determine the appropriate damages under the FTCA against the United States of America.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand a jury to try the case (against D.C. and Hope Village) and the Court enter a judgment against the Defendants, including -

   a)  All compensatory damages allowable;

   b)  Punitive damages due to Hope Village and the District's reckless conduct;

   c)  Punitive damages against the District due to extraordinary circumstances;

   d)  All legally permitted pre-judgment and post-judgment interest;

   e)  Cost of suit; and

   f)  Such other and further relief to which they may be entitled.

Respectfully submitted,

**GIDEON, COOPER & ESSARY, PLC**

J. Blh

**C.J. Gideon, Jr.,** _TNoo17_
**J. Blake Carter,** _TNoo16_
315 Deaderick Street, Suite 1100
Nashville, TN  37238
(615) 254-0400

_Counsel for Plaintiffs_