# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**LANA M. PAAVOLA,**
**Individually and as Administrator of the**
**Estate of Joel D. Paavola,**

      **Plaintiff,**

      **v.**

**UNITED STATES OF AMERICA, et al.,**

      **Defendants.**

**Civil Action No. 19-1608 (JDB)**

## MEMORANDUM OPINION

Plaintiff Lana Paavola, individually and on behalf of the estate of her late husband Joel D. Paavola and his beneficiaries, sued the United States, the District of Columbia, and Hope Village, Inc., for their alleged roles in the tragic death of her husband. Defendants have each moved to dismiss plaintiff's complaint. For the reasons explained below, the Court concludes that plaintiff has failed to state a claim against either the United States or the District of Columbia. The Court also concludes that some of plaintiff's claims against Hope Village must be dismissed. The Court will therefore grant in full the motions filed by the United States and the District of Columbia and will grant in part and deny in part the motion filed by Hope Village.

## Background

At the pleading stage, district courts accept as true a plaintiff's factual allegations, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and thus the Court rehearses here the facts as presented in plaintiff's complaint. On April 27, 2018, Domenic Micheli was arrested for trespassing on the White House lawn in Washington, D.C. Compl. [ECF No. 1] ¶ 19. On May 1, Mr. Micheli appeared at his arraignment, where he claimed to be the President of the United States

and stated that he had come to Washington to lead the nation.  <u>Id.</u> ¶ 20.  He also disclosed that he had previously been treated for mental health issues in Nashville, Tennessee.  <u>Id.</u>  He was held in D.C. jail until his detention hearing on May 2, when the magistrate judge determined that he was to be released to the D.C. Department of Corrections for placement in a halfway house.  <u>Id.</u> ¶¶ 20– 22.  As part of his release order, the Magistrate Judge instructed that "[t]he D.C. Department of Corrections is Directed to Notify the Court Immediately by FAX of Defendant's Escape or Remand to the D.C. Jail."  <u>Id.</u> ¶ 21.  During this period, Mr. Micheli underwent at least two mental competency evaluations, which returned "concerning" and "equivocal" results.  <u>Id.</u> ¶¶ 24, 26.  At a hearing before the U.S. District Court on May 18, a member of the Pretrial Services Agency ("PSA") stated that a third such evaluation was set for May 21.  <u>Id.</u> ¶ 26.

On May 15, 2018, Mr. Micheli checked into the Hope Village halfway house.  <u>Id.</u> ¶ 25. "After May 18," according to plaintiff, "Mr. Micheli failed to comply with the terms of his confinement at Hope Village."  <u>Id.</u> ¶ 27.  At some point, he absconded from the facility and made his way to Tennessee, where he murdered his former employer, Joel Paavola, on June 4.  <u>Id.</u> ¶¶ 31– 34.  Mr. Micheli had worked for Mr. Paavola at a fitness facility in Tennessee until 2017, when Mr. Paavola fired him.  <u>Id.</u> ¶ 19.

Plaintiff alleges that "[p]rior to Mr. Micheli's escape from Hope Village, Mr. Micheli's family and friends warned the Defendants that Mr. Micheli was an escape risk and was dangerous" and that he "might injure someone if not detained."  <u>Id.</u> ¶ 28.  Plaintiff also asserts that, after absconding from Hope Village, but before murdering Mr. Paavola, "Mr. Micheli posted a series of bizarre and deeply concerning messages on Facebook," wherein he declared himself a deity, threatened to dole out justice, and "boasted he could 'kill nine tenths'" of the global population and "be within justice."  <u>Id.</u> ¶ 29.  Plaintiff alleges that, "[u]sing these posts, law enforcement could

have located and apprehended Mr. Micheli before he murdered Joel Paavola." Id.

Plaintiff filed this lawsuit against the United States, the District of Columbia, and Hope Village on June 3, 2019, bringing nine counts that include claims of wrongful death, negligent supervision, state endangerment and deliberate indifference, intentional infliction of emotional distress, and breach of contract. Id. ¶¶ 36–106. Each defendant has separately moved to dismiss plaintiff's claims, and all three motions are now ripe for consideration.

## Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court presumes the truth of a complaint's factual allegations; it is, however, "not bound to accept as true a legal conclusion couched as a factual allegation." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation omitted). The key question is whether the complaint "state[s] a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (internal quotation omitted). When "a complaint pleads fact that are merely consistent with a defendant's liability," but goes no further, that complaint "stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). The court considers the "facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." Mpoy v. Rhee, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (internal quotation omitted).

## Analysis

Plaintiff brings a variety of claims against the United States, the District of Columbia, and Hope Village. Because many of the claims and corresponding defenses overlap, the Court examines each type of claim in turn, addressing the defendants' specific arguments as needed.

## I.     Wrongful Death

Plaintiff first sues all three defendants for wrongful death; relatedly but in the alternative, she brings claims under D.C.'s wrongful death statute, D.C. Code § 16-2701; D.C.'s survival action statute, D.C. Code § 12-101; and Tennessee's wrongful death statute, Tenn. Code § 20-5-101. Compl. ¶¶ 37–47, 67–77, 79–88. At root, each of these claims turns on whether defendants were negligent. To succeed, therefore, plaintiff must demonstrate (1) the existence of a duty owed by a defendant to the plaintiff, (2) a breach of that duty by the defendant, and (3) damage, proximately caused by the breach, to the interests of the plaintiff. See District of Columbia v. Cooper, 483 A.2d 317, 321 (D.C. 1984); Bradshaw v. Daniel, 854 S.W.2d 865, 869 (Tenn. 1993) ("No claim for negligence can succeed in the absence of any one of the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal cause.").

### a.  District of Columbia

To start, the District argues that plaintiff's negligence claim is barred by the public duty doctrine and that even if this doctrine does not apply, plaintiff has failed to "plead facts showing that [Mr. Micheli's] crime . . . was reasonably foreseeable" or that the District's actions "proximately caused Mr. Paavola's death." Def. District of Columbia's Mem. of P. & A. in Supp. of its Mot. to Dismiss Pls.' Compl. ("District Mot.") [ECF No. 10] at 16–17. Because the Court concludes that the public duty doctrine applies, it will refrain from addressing the District's secondary arguments.

"The public duty doctrine originated at common-law and shields a public employee from suits for injuries that are caused by the public employee's breach of a duty owed to the public at

large."   Ezell v. Cockrell, 902 S.W.2d 394, 397 (Tenn. 1995); see also Klahr v. District of

Columbia, 576 A.2d 718, 719–20 (D.C. 1990) ("When a claim is made that the District negligently

failed to protect someone from harm, the person advancing that claim must reckon at the outset

with the fundamental principle that a government and its agents are under no general duty to

provide public services . . . to any particular individual citizen." (internal quotation marks

omitted)).   There are exceptions to this general principle, however, when the government owes a

special duty to the plaintiff.   See Klahr, 576 A.2d at 719.   These exceptions vary by state.   Under

Tennessee law, immunity is eliminated when:

> (1) a public official affirmatively undertakes to protect the plaintiff and the plaintiff
> relies upon the undertaking;
> (2) a statute specifically provides for a cause of action against an official or
> municipality for injuries resulting to a particular class of individuals, of which the
> plaintiff is a member, from failure to enforce certain laws; or
> (3) a plaintiff alleges a cause of action involving intent, malice, or reckless
> misconduct.

Chase v. City of Memphis, 971 S.W.2d 380, 385 (Tenn. 1998) (quoting Ezell, 902 S.W.2d at 402).

But D.C. law, by contrast, recognizes only the first two exceptions.   See Klahr, 576 A.2d at 720;

see also Turner v. District of Columbia, 532 A.2d 662, 667 (D.C. 1987) ("[A] statute or regulation

may describe a special duty to a particular class of individuals." (quotation omitted)).

Plaintiff focuses on the third exception under Tennessee law, contending that the District

acted "with reckless misconduct" by "permitt[ing] and maintain[ing] a culture of lax detention and

supervision of pretrial detainees."   Pls.' Resp. in Opp'n to Def. District of Columbia's Mot. to

Dismiss ("Pl.'s District Opp'n") [ECF No. 18] at 10–11.   By plaintiff's telling, "the District knew

Mr. Micheli was mentally ill" and dangerous, "knew arrestees in its custody placed with Hope

Village routinely escaped," and yet did "nothing to ensure [he] did not escape" or to "comply with

a Court Order requiring immediate notification so the U.S. Marshals would apprehend" him if he

did escape.   Id. at 12.

Because the laws of D.C. and Tennessee are different, and that difference is material to resolving the present dispute, the Court must first engage in a choice-of-law analysis to determine whether this third exception under Tennessee law even applies to the present suit.  The forum is D.C., and hence, the Court relies on D.C. choice-of-law principles in making this determination.  Bodoff v. Islamic Republic of Iran, 424 F. Supp. 2d 74, 83 (D.D.C. 2006).  Normally, "[u]nder District of Columbia choice of law rules, courts employ a refined government interest analysis under which they 'evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review.'"  Id. (quoting Hercules & Co. v. Shama Rest. Corp., 566 A.2d 31, 41 (D.C. 1989) (quotation omitted)).  Under this approach, the Court must "balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more substantial interest in the resolution of the issue."  Lamphier v. Wash. Hosp. Ctr., 524 A.2d 729, 731 (D.C. 1987) (internal quotation marks omitted).  "This inquiry is to include consideration of several contacts, including (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship centered."  Jaffe v. Pallotta TeamWorks, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (internal quotation marks omitted).

Here, the balance of factors tips in favor of D.C.  The District's allegedly reckless conduct all took place in D.C., and the alleged relationship between Mr. Paavola and the District— allegedly grounded in statutory and contractual duties—is rooted in D.C.  The residences of the parties cancel each other out, as plaintiff resides in Tennessee, but all the defendants are based in D.C.  Thus, the only factor weighing clearly in favor of Tennessee is the place of the injury.  While this factor is often given considerable weight in personal injury suits, see Hercules, 566 A.2d at

42, the D.C. Court of Appeals has recognized that "it is not the place of the injury that necessarily determines which law is to be applied" because that location "may be a mere 'fortuity' in light of the fact that the relationship of the parties to the litigation is centered elsewhere." Rong Yao Zhou v. Jennifer Mall Rest., Inc., 534 A.2d 1268, 1270 (D.C. 1987). Such is the case here, where plaintiff's claims are based on defendants' actions and inactions solely within D.C.—no relevant conduct by defendants giving rise to plaintiff's claims occurred in Tennessee.

Plaintiff offers an alternative approach to determining which body of law applies. Based on the D.C. Circuit's decision in Lewis v. Reconstruction Fin. Corp., 177 F.2d 654 (D.C. Cir. 1949), she argues that "the law of the state where the fatal injuries occurred should govern, unless the public policy of the forum is clearly opposed," id. at 656. Plaintiff reasons that, by the logic of Lewis, the law of Tennessee should apply because Mr. Paavola's murder unquestionably took place in Tennessee, and "[a]pplication of Tennessee law substantially advances the interests of the District's citizens, who have a strong interest, for their own safety, in ensuring the regulation of conduct of Defendants." Pl.'s District Opp'n at 9; see also Smith v. Hope Village, Inc., 481 F. Supp. 2d 172, 206 (D.D.C. 2007) ("[I]n this instance, the interests of the District are substantially advanced by the application of Maryland law to the plaintiff's claim.").

Plaintiff's argument is unpersuasive. To start, the D.C. Circuit decided Lewis in 1949, and although a couple of courts have recently cited favorably its holding with respect to statutes of limitations, see, e.g., Smith, 481 F. Supp. 2d at 206; Jaffe v. Pallotta TeamWorks, 276 F. Supp. 2d 102, 107 (D.D.C. 2003) ("[T]he Court will apply Virginia's two-year statute of limitations to the wrongful death claim because the limitations period in Virginia's wrongful death act is substantive . . . ."), rev'd on other grounds, 374 F.3d 1223 (D.C. Cir. 2004), its reasoning sits at odds with the modern approach to conflicts of law. Indeed, since at least the publication of the

Second Restatement of Conflicts of Law in 1971, courts have opted to apply the law of the state with "the most significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws Intro. (internal quotation marks omitted); see also Jaffe, 374 F.3d at 1227 ("[T]he District of Columbia follows the substantial interest position of the Restatement (Second) of Conflict of Laws . . . , under which the court will balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more substantial interest in the resolution of the issue." (internal quotation marks omitted)). The Court thus doubts whether, in applying the law of the forum (i.e., D.C.), Lewis remains a relevant authority.

But, even assuming that Lewis is good law, its holding has little bearing on which state's public duty doctrine applies. Lewis concerned whether the statute of limitations under Nebraska law (where the death occurred) or under D.C. law (the litigation forum) should control the case. The D.C. Circuit reasoned that, in the case of "rights of action of a purely statutory nature, such as the so-called wrongful death statutes, the time thereby prescribed for filing suit operates as a limitation of the liability itself." Lewis, 177 F.2d at 655. Under such circumstances, the Lewis court reasoned, "time has been made of the essence of the right," and the temporal limits on liability are part of the substance of the cause of action, not a secondary procedural limit. See id. And so, unless a conflict of "policy" arises between two jurisdictions, the law of the state that provides the cause of action alleged by the plaintiff should prevail. Id. at 656. Lewis also emphasized that the D.C. wrongful death statute had no force in the litigation, for the statute was limited to "death resulting from injuries suffered within the District of Columbia." Id. Given that plaintiffs could not rely on that D.C. provision—along with its statute of limitations—to bring their claim, resort to the Nebraska statute of limitations seemed more appropriate. Id.

Here, too, Mr. Paavola's death resulted from injuries suffered outside D.C., thus plaintiff

must rely on Tennessee Code § 20-5-101, rather than D.C. Code § 16-2701, to bring her wrongful death claim.[1]  Unlike in <u>Lewis</u>, however, the public duty doctrine invoked by the District is not a built-in limitation on the wrongful death statute itself; instead, it is a matter of common law in D.C. (or Tennessee) that shields public actors from liability for negligent acts, applicable to all negligence actions, not just to actions under the wrongful death statute.  Under such circumstances, the narrow exception created by <u>Lewis</u> in the context of the statute of limitations specific to a statutory wrongful death action seems less appropriate and, instead, the Court relies on D.C.'s standard competing-interests test for the choice-of-law analysis.  <u>See</u> <u>District of Columbia v. Coleman</u>, 667 A.2d 811, 816 (D.C. App. 1995) ("We are not bound to decide all issues under the law of a single jurisdiction; choice of law involves examination of the various jurisdictional interests as applied to the various distinct issues to be adjudicated."); <u>see also</u> <u>Jaffe</u>, 374 F.3d at 1227 ("[U]nder District of Columbia choice of law rules, [d]ifferent law may apply to different issues in a lawsuit." (second alteration in original) (internal quotation marks omitted)).  As noted above, that test results in D.C.'s law being applied to the question of negligence and the public duty doctrine.

Plus, even under the <u>Lewis</u> test, it is arguable that D.C. public policy <u>does</u> militate against applying Tennessee's approach.  Indeed, in 2016, the D.C. Council codified the version of the public duty doctrine outlined in <u>Allen v. District of Columbia</u>, 100 A.3d 63 (D.C. 2014), which itself reflects the two exceptions outlined in <u>Klahr</u> but not a third exception for recklessness.  <u>See</u> <u>Matthews v. District of Columbia</u>, Civil Action No. 18-1190 (RDM), 2019 WL 224254, at *4 n.2

---

[1] Several decisions in this District have awarded damages under the Foreign Sovereign Immunities Act based on causes of action under D.C. Code § 16-2701 even when the injuries did not arise within the District.  <u>See</u> <u>Ben-Rafael v. Islamic Republic of Iran</u>, 540 F. Supp. 2d 39, 58 (D.D.C. 2008) (gathering cases).  While these cases sit in tension with <u>Lewis</u>, the Court maintains that, at least in the non-FSIA posture, it is best to interpret the language of § 16-2701 literally and limit its applicability to those deaths arising from injuries sustained in D.C.

(D.D.C. Jan. 16, 2019). The two-exception version thus reflects a policy choice by D.C. not to hold public institutions accountable except in instances where a special relationship exists. See Klahr, 576 A.2d at 720; Turner, 532 A.2d at 667. Applying Tennessee's third exception would expose public institutions to liability that D.C. has considered inappropriate. See also Johnson v. District of Columbia, Civil Action No. 03-2548 (GK), 2006 WL 2521241, at *9 (D.D.C. Aug. 30, 2006) (describing the exception to the public duty doctrine as "narrow"). In sum, then, the Court concludes that D.C.'s competing-interests test applies here and dictates the application of D.C. law.

Plaintiff next argues that, even under D.C. law, she still overcomes the public duty doctrine because the District has a specific duty under the "Release Order to immediately notify the Court if [he] escaped," but that "the District ignored the Court's Order." Pl.'s District Opp'n at 13–14. In other words, plaintiff appears to suggest that the Release Order established a special relationship between the District and those individuals that might possibly be injured by Mr. Micheli. But the Release Order cannot carry that weight.

Plaintiff relies on Turner v. District of Columbia, id., but Turner is readily distinguishable from the present facts in a number of ways. The case involved a suit against the District "for negligent failure to fulfill its statutory obligations under the Prevention of Child Abuse and Neglect Act." 532 A.2d at 666. The Turner court observed that the Act "imposes upon certain public officials specific duties and responsibilities which are intended to protect a narrowly defined and otherwise helpless class of persons: abused and neglected children." Id. at 668 (emphasis added). Given the specific nature of the Act and the narrowness of the class involved, the court concluded that the Act "created a special relationship between the District and the two children" and that "the District had a duty to take certain steps prescribed by the Act for the protection of those children."

10

Id. at 675.  Of particular relevance to this case, the Turner court also noted that its decision was "exceptional" and that, "[w]ere it not for the [Act], [the court] would, in all likelihood, be bound to" grant judgment for the District under the public duty doctrine.  Id. at 675 n.11.

The facts here are markedly different than in Turner.  Although the court's Release Order may have directed the District to notify the court immediately of Mr. Micheli's release, plaintiff does not allege that the order was "intended to protect a narrowly defined and otherwise helpless class of persons," id. at 668, as required to fall under the exception to D.C.'s public duty doctrine, see Morgan v. District of Columbia, 468 A.2d 1306, 1314 (D.C. 1983).  Likewise, the District's alleged cuts to funding and staffing, despite a history of problems at Hope Village, are the types of policy decisions that affect the system and public as a whole.[2]  Plaintiff also does not allege that there was a specific piece of legislation here analogous to the Act in Turner.

The Court thus concludes that, because D.C. law applies with respect to the public duty doctrine and plaintiff has not pled facts showing that any of the relevant exceptions to that doctrine apply, Count 1—plaintiff's claim of wrongful death against the District—must be dismissed.

**b.  United States**

Plaintiff attempts to bring its various wrongful death claims against the United States by way of the Federal Tort Claims Act ("FTCA"), see Compl. ¶ 8, which affords this Court jurisdiction over civil actions for "personal injury or death caused by the negligent or wrongful act

---

[2] Plaintiff also argues that the District is liable under an exception to the public duty doctrine laid out in White v. United States, 780 F.2d 97 (D.C. Cir. 1986).  But the D.C. Court of Appeals has clarified that White "is not binding" under D.C. law and therefore does not "modify the [D.C.] public duty doctrine." Klahr, 576 A.2d at 718 (citing M.A.P. v. Ryan, 285 A.2d 310, 312 (D.C. 1971)).  White is also distinguishable on the merits, for it turned on a D.C. law, now repealed, that categorized all defendants deemed "criminally insane" as presumptively "dangerous" and unable to be released absent a court order.  White, 780 F.2d at 103; see Turner v. District of Columbia, No. Civ. A. 04-0048 (RMC), 2006 WL 566121, at *12 (D.D.C. Mar. 7, 2006).  Mr. Micheli, by contrast, was a pre-trial detainee not subject to a statutory presumption of dangerousness.  Cf. Klahr, 576 A.2d at 721 (distinguishing White from the case of an absconding detainee who was "convicted of only a misdemeanor," "sentenced to a work-release program, and had not exhibited any propensity to commit violent crimes").

or omission of any employee of the Government . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1).   As with the District, plaintiff brings alternative claims against the United States of wrongful death under D.C. Code § 16-2701, a survival action under D.C. Code § 12-101, and wrongful death under Tennessee Code § 20-5-101. Compl. ¶ 67.   For the reasons explained above, the Tennessee statute provides the only viable statutory hook given D.C. Code § 16-2701's limitation to deaths caused "by an injury done or happening within the limits of the District."   D.C. Code § 16-2701(a).

Plaintiff alleges that, prior to Mr. Micheli's detention at Hope Village, the United States was aware of "multiple inexcusable failures in the management, supervision, and detention of pretrial arrestees" held at Hope Village.   Compl. ¶ 13.   Indeed, she alleges that Hope Village accounted for ten percent of all escapes, walkaways, and failures to return in the federal system in 2016 and 2017.   Id. ¶ 15.   She claims that, through its agents—PSA and the Court Services and Offender Supervision Agency ("CSOSA")—"the United States was negligent and/or reckless by not taking steps to protect the public by correcting [such] errors and mistakes," and thereby violated various duties to oversee pretrial detainees and remedy any escape by such a detainee.   Id. ¶¶ 67–69.

The United States raises several grounds for dismissing this claim, including quasi-judicial immunity, the inapplicability of the FTCA, the discretionary function exception, and the absence of a duty.   Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss ("U.S. Mot.") [ECF No. 29] at 4–11.   The Court analyzes each argument in turn.

First, the United States argues that PSA and CSOSA are entitled to judicial or quasi-judicial immunity.   Under the common law, judges have "absolute immunity from liability for damages

based upon acts committed within their judicial jurisdiction." Turner v. Barry, 856 F.2d 1539, 1540 (D.C. Cir. 1988) (per curiam). "This absolute immunity has been extended to other quasi-judicial officials when (1) their activities are integrally related to the judicial process, and (2) they must exercise discretion comparable to that exercised by a judge." Id.

The United States argues that such an immunity applies here because the district court "ordered Mr. M[i]cheli's placement into the hallway house," and these agencies' decisions "when and what to report to the [district court] regarding an offender's compliance with release . . . are integral to the role that these federal employees play in the judicial process." U.S. Mot. at 4. The United States likens PSA and CSOSA to parole commissioners and probation officers, on whom courts in this Circuit have conferred judicial or quasi-judicial immunity in some circumstances. Id. at 4–5. But the cases that the United States cites concern actions taken in furtherance of the court's judicial function and are distinct from the supervisory role that PSA and CSOSA play in overseeing pretrial detention. For instance, in Khan v. Holder, 134 F. Supp. 3d 244 (D.D.C. 2015), the district court concluded that probation officers had quasi-judicial immunity from liability for damages arising from alleged misstatements in plaintiff's documentation that kept him detained beyond his release date, id. at 253–54. The court also concluded that "[t]he unknown agents of the Bureau of Prisons and U.S. Marshals Service" who operated based upon these erroneous reports were also shielded by "absolute quasi-judicial immunity." Id. at 254.

Here, on the other hand, PSA and CSOSA were neither acting in a judicial capacity nor following the erroneous orders of another officer acting in such a capacity when the tortious conduct arose. "When assessing a claim of absolute immunity, 'the nature of the function performed, not the identity of the actor who performed it' is the Court's focus." Whittaker v. Court Servs. & Offender Supervision Agency for D.C., 401 F. Supp. 3d 170, 180 (D.D.C. 2019) (quoting

Forrester v. White, 484 U.S. 219, 229 (1988)). In Whittaker, for example, the court concluded that CSOSA's alleged misconduct in "probation supervision," "the investigations of alleged [probation] violations," and "the failure to seek revocation of . . . probation" concerned functions that were "investigatory in nature and not entitled to absolute immunity." Id. at 180 (emphasis added); see also Johnson v. Williams, 699 F. Supp. 2d 159, 167–68 (D.D.C. 2010) (denying absolute immunity to CSOSA officers where "the plaintiff alleges that [the] defendants acted improperly with respect to his parole supervision, the investigation of alleged violations of the conditions of his parole release, and the preparation of reports on which the [Parole Commission] relied in . . . revoking his parole"), aff'd sub nom. Johnson v. Fenty, No. 10-5105, 2010 WL 4340344 (D.C. Cir. Oct. 1, 2010) (per curiam). Likewise, plaintiff's allegations here are based upon supervisory and law enforcement functions of PSA and CSOSA. Plaintiff alleges that "PSA, which had an independent oversight duty over Mr. Micheli, . . . failed to notify the appropriate authorities of [his] failure to comply with the terms of his release." Compl. ¶ 27. She also alleges that PSA and CSOSA "failed to take any steps to ensure that Mr. Micheli was apprehended before he would harm" his victims. Id. Under such circumstances, judicial or quasi-judicial immunity does not apply.

Second, the United States argues that the types of actions for which plaintiff attempts to hold the United States liable are not the sort that would subject "a private individual under like circumstances" to liability and thus cannot trigger liability under the FTCA. U.S. Mot. at 5. Plaintiff alleges that PSA failed "to monitor Mr. Micheli to ensure compliance with the terms of his release and to ensure appearance at future hearings" and failed to comply with the statutory mandate, under 18 U.S.C. § 3154, to inform the district court and U.S. Attorney of Mr. Micheli's release violations. Compl. ¶¶ 23, 27. The United States contends that a private person could not

be held liable for such actions (or omissions) because "private individuals are not engaged in the work of supervising probationers or updating law enforcement on the actions of those under Court supervision." U.S. Mot. at 7.

It is true that, absent a private analogue to the actions of PSA and CSOSA, plaintiff's claim under the FTCA must fail. See 28 U.S.C. § 1346(b)(1) (waiving sovereign immunity "under circumstances where the United States, if a private person," would be liable). "While Defendants are not insulated from liability merely because the acts alleged are uniquely government functions, if [plaintiff's] claims are 'wholly grounded on a duty created by a federal statute such that there is no local law that could support liability of a private party for similar actions, the FTCA does not apply.'" Whittaker, 401 F. Supp. 3d at 183 (quoting Hornbeck Offshore Transp., LLC v. United States, 569 F.3d 506, 510 (D.C. Cir 2009) (internal quotation marks omitted)). But the alleged actions here do have private analogues under D.C. tort law. See, e.g., Smith, 481 F. Supp 2d at 187 (concluding that Hope Village, a private entity, assumed a duty to exercise reasonable care when housing and supervising "convicted criminals, including violent felons"); Thomas v. City of Lights School, Inc., 124 F. Supp. 2d 707, 709–11 (D.D.C. 2000) (determining that a private school had a "duty [under D.C. law] to supervise its students . . . to guard against foreseeable harm" both to its students and to the public); see also Restatement (Second) Torts § 315 (1965) (recognizing a duty "to control the conduct of a third person as to prevent him from causing physical harm" in the event of "a special relation . . . between the actor and the third person which imposes [such] a duty").

The United States argues that there is a distinction between institutions like Hope Village, which house pretrial detainees, and PSA, which had the duty "to monitor Mr. Micheli weekly and allow him to remain in a halfway house." Reply to Pl.'s Resp. to the United States' Mot. to Dismiss

("U.S. Reply") [ECF No. 35] at 12.[3]  But the duty to house involves "direct and custodial control" that encompasses the types of obligations assigned to PSA, including checking in on a detainee's status.  See Smith, 481 F. Supp. 2d at 198 n.21.  The fact that PSA's duties were less rigorous than an established private analogue does not eliminate liability under the FTCA.  And, in any event, courts have determined that an analogous duty to monitor exists with respect to private educators' "duty to supervise its students to prevent foreseeable harm from occurring to members of the public while on a field trip."  Thomas, 124 F. Supp. 2d at 710.

For its third defense, the United States argues that it is shielded from liability by the discretionary function exception to the FTCA.  U.S. Mot. at 9–11.  As with its first two defenses, however, this argument does not hold up.  "The discretionary function exception applies to government actions 'that are discretionary in nature' and 'involv[e] an element of judgment or choice.'"  Whittaker, 401 F. Supp. 3d at 181 (quoting United States v. Gaubert, 499 U.S. 315, 322 (1991)).  The exception "was designed to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, or political policy," and its application is limited to such "decisions based on considerations of public policy."  Id. (internal quotation marks omitted); see also Cope v. Scott, 45 F.3d 445, 450 (D.C. Cir. 1995) ("[T]he discretionary function exception applies only where the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." (internal quotation marks omitted)).

Here, plaintiff's claim is that PSA was bound under 18 U.S.C. § 3154 to "[i]nform the [district] court and the United States attorney of all apparent violations of [Mr. Micheli's] pretrial

---

[3] The United States does not mention CSOSA in its reply, but presumably the same argument based on the lack of a private analogue would apply to CSOSA, which plaintiff alleges has the same duties under 18 U.SC. § 3154. Compl. ¶ 8. At the same time, even if no private analogue existed for CSOSA, the existence of a parallel private duty for PSA existed and thus still exposed the United States to liability.

release conditions . . . and any danger that [he] may come to pose to any other person or the community."  18 U.S.C. § 3154(5).[4]  These allegations leave unanswered many questions as to what or when PSA learned about Mr. Micheli's abscondment or what role at all CSOSA played. Indeed, some of plaintiff's allegations suggest that PSA was not informed of Mr. Micheli's departure for some time.  See Compl. ¶ 27 ("Hope Village . . . failed to timely notify the appropriate authorities, including the PSA . . . .").

Nevertheless, plaintiff is right that the language of 18 U.S.C. § 3154 speaks in absolute terms—"all apparent violations" and "any danger" that a detainee might come to pose.  The United States replies that the statutory language "does not impose any time restrictions as to when PSA must report violations of supervisory conditions."  U.S. Reply at 8.  True enough, but plaintiff alleges not just that PSA was untimely in notifying the relevant authorities, but that it "failed to notify" them.  See Compl. ¶ 27.  Were this case to move on to discovery, it may become clear that PSA never learned any information to pass on, or by which to adjust its view of Mr. Micheli's dangerousness.  Indeed, it might even become clear that PSA did send such reports as necessary, despite plaintiff's allegations.  At this stage, however, the United States's argument based on the discretionary function exception to the FTCA cannot succeed, because plaintiff pleads sufficient facts to show nondiscretionary obligations that PSA may have failed to fulfill.

Finally, the United States argues that plaintiff has failed to identify any duty owed to Mr. Paavola by CSOSA or PSA.  U.S. Mot. at 7–8.  Although the United States's briefing does not precisely frame this point in such terms, this argument is essentially a version of the District's argument based on the public duty doctrine.  See id. at 8 (citing Cunningham v. District of

---

[4] The complaint also catalogues at least ten other duties that PSA allegedly owed to plaintiff, see Compl. ¶¶ 69–70, but these portions of the complaint are conclusory legal allegations, rather than factual allegations, and thus do not suffice to make out a claim.  See Papasan v. Allain, 478 U.S. 265, 286 (1986) ("[Courts] are not bound to accept as true a legal conclusion couched as a factual allegation.").

Columbia, 584 A.2d 573, 575 (D.C. App. 1990) (affirming dismissal based on the public duty doctrine)).  Unlike with its previous three arguments, then, the United States is correct here that it is shielded from civil liability to plaintiff.

As with the District, D.C. common law once again applies when assessing whether the United States, through PSA and CSOSA, was negligent in its handling of Mr. Micheli.  D.C.'s version of the public duty doctrine thus also applies.  Like the District, neither PSA nor CSOSA owed a particular duty to plaintiff beyond the general duty that they owed to the public.  See Cunningham, 584 A.2d at 575 (collecting cases).  As with the Release Order for the District, 18 U.S.C. § 3154's reporting requirement was not "intended to protect a narrowly defined and otherwise helpless class of persons."  Turner, 532 A.2d at 668.  Accordingly, the public duty doctrine bars plaintiff's claim against the United States.

Plaintiff's only response is to argue that Tennessee's public duty doctrine, rather than D.C.'s more limited version, should apply in this case.  Pls.' Resp. to Mot. to Dismiss Filed by the United States [ECF No. 30] at 11–12.  As explained above, outside of the narrow context of Lewis, which concerned conflicts between states' statutory time limits for filing wrongful death claims, D.C. employs a competing-interests test that leans in favor of applying D.C. law in this case.  See Lamphier, 524 A.2d at 731.  The same reasoning holds with respect to plaintiff's claim against the United States, meaning that the narrower D.C. public duty doctrine applies and, as just noted, eliminates liability.

In sum, although three of the United States's defenses are inadequate to shield it from liability, plaintiff's wrongful death claim against the United States ultimately fails under the public duty doctrine.  The Court will thus dismiss Count 5 against the United States.

### c.  Hope Village

Unlike the other two defendants, Hope Village is "a privately owned entity," Mem. of P. & A. in Supp. of Def. Hope Village Inc.'s Mot. to Dismiss Compl. ("Hope Village Mot.") [ECF No. 16-1] at 1, and thus cannot benefit from the public duty doctrine or other immunities reserved for public entities.  Instead, Hope Village argues that plaintiff has failed to state a claim for negligence against it because plaintiff did not include sufficient factual allegations to establish either that Hope Village breached a duty or that the ultimate murder of Mr. Paavola was proximately caused by Hope Village's conduct (or lack thereof).  Id. at 3–10.

Turning first to the existence of a duty, Hope Village argues that most of the duties that plaintiff cites in her complaint are merely conclusory legal assertions, rather than claims backed by factual allegations.  Id. at 4.  As with the catalogue of duties attributed to PSA, it is asserted, these conclusory legal claims are not sufficient to survive at the pleadings stage.  See Papasan, 478 U.S. at 286.[5]  Despite the deficiencies in just listing various duties, however, plaintiff does present adequate factual allegations to establish certain duties on the part of Hope Village.  She alleges that "Mr. Micheli checked into Hope Village halfway house"; that at some point "[a]fter May 18, 2018, Mr. Micheli failed to comply with the terms of his confinement at Hope Village"; and that Hope Village "failed to timely notify the appropriate authorities."  Compl. ¶¶ 25, 27.  Plaintiff also alleges that Mr. Micheli had a history of mental health issues and that his "family and friends [had] warned" Hope Village that he "was an escape risk and was dangerous."  Id. ¶¶ 20, 24, 26, 28.

Assuming the truth of these allegations, as the Court must, plaintiff has adequately

---

[5] Hope Village does acknowledge that plaintiff provides a factual basis for at least one duty, Hope Village Mot. at 4–5; plaintiff alleges that Hope Village "contracted with the D.C. Department of Corrections, the CSOSA, and/or the United States government to provide halfway house services to criminal offenders," Compl. ¶ 10.  Plaintiff also alleges that Hope Village "was bound by a Statement of Work or contract it agreed to." Id. ¶ 27.  But, as will be explained below, these contractual obligations do not create a duty to plaintiff, see infra at 30–33, and, therefore, cannot be the basis for plaintiff's wrongful death claim against Hope Village.

demonstrated that Hope Village, by taking custody of a possibly mentally unwell and dangerous individual in Mr. Micheli, assumed "a duty to exercise reasonable care to control [him] to prevent him from doing . . . harm."  Restatement (Second) of Torts § 319; see also Smith, 481 F. Supp. 2d at 187 ("[T]o the extent that the criminal offenders within its care are, by dint of their history of violent crime or other, similar indicia, foreseeably likely to cause bodily harm to others if not controlled, Hope Village has an identical duty to exercise reasonable care to control its residents." (alterations and internal quotation marks omitted)).  One aspect of this "reasonable care" is to prevent dangerous detainees from absconding, but it also follows that a halfway house, like Hope Village, must "make reasonable efforts"—by notifying the proper authorities, for instance—when such an escape or abscondment does occur.  See Smith, 481 F. Supp. 2d at 187; cf. Thomas, 124 F. Supp. 2d at 711 (recognizing a private school's duty to "exercise reasonable care in supervising its students to prevent foreseeable harm to members of the public during the field trip").

Hope Village responds in two ways.  First, it argues that the allegation that Hope Village failed to notify the necessary authorities cannot be true because plaintiff elsewhere alleges that "[i]n advance of June 4, 2018, the D.C. Department of Corrections became aware that Mr. Micheli was not complying with the terms of the Release Order," Compl. ¶ 30.  Hope Village Mot. at 5–6. Hope Village contends that this allegation logically entails that the halfway house did take reasonable steps after Mr. Micheli absconded and also complied with its contractual duty to notify the appropriate authorities.  Id.  Second, Hope Village attempts to introduce records demonstrating that it provided just such a notification.  Id.  Neither of these points demonstrates that Hope Village did not have a duty to notify the relevant authorities, which is the actual legal question at hand. Rather, they question the factual accuracy of plaintiff's factual allegation that Hope Village failed to satisfy this duty.  Cf. Compl. ¶ 27.  Such factual disputes are ill-suited for the pleadings stage

and hence generally not appropriate for resolution on a motion to dismiss.

Hope Village also challenges whether plaintiff has pled sufficient facts to show that Mr. Paavola's death was foreseeable. Under D.C. law, "where an injury is caused by the intervening criminal act of a third party, a defendant is liable for negligence only if the danger of that act should have been reasonably anticipated and protected against." District of Columbia v. Doe, 524 A.2d 30, 32 (D.C. App. 1987) (internal quotation marks omitted). "If . . . the intervening act can fairly be said to be that which could not have been reasonably anticipated, plaintiff may not look beyond the intervening act for his recovery." St. Paul Fire & Marine Ins. Co. v. James G. Davis Constr. Corp., 350 A.2d 751, 752 (D.C. App. 1976). At the same time, "foreseeability . . . is nearly always a question of fact for the jury" and not best resolved at the pleading stage. District of Columbia v. Carlson, 793 A.2d 1285, 1291 (D.C. 2002) (internal quotation marks omitted).

Here, it is a close call whether plaintiff has pled sufficient facts to satisfy this heightened foreseeability standard. Unlike in Smith v. Hope Village, which plaintiff cites extensively, see Pls.' Resp. in Opp'n to Def. Hope Village's Mot. to Dismiss ("Pl.'s Hope Village Opp'n") [ECF No. 21] at 9–12, 14–15, Mr. Micheli is not alleged to have had a history of violence or escape or to have previously violated the conditions of his detention at Hope Village prior to his abscondment, cf. 481 F. Supp. 2d at 177–79. But plaintiff does allege a number of facts that raise the question whether Hope Village was or should have been on notice that Mr. Micheli posed a violent threat to the community or to his former employer, Mr. Paavola. See, e.g., Compl. ¶¶ 20 (noting Mr. Micheli's "prior mental health care in Nashville" and the federal government's view of him "as a serious flight risk based on his statements to the Secret Service"), 24 (noting that "Mr. Micheli provided irrational information" to his mental examiner), 28 ("Mr. Micheli's family and friends warned the Defendants that Mr. Micheli was an escape risk and was dangerous . . . [and]

might injure someone if not detained."). Assuming the truth of these factual allegations, plaintiff plausibly claims that Hope Village had reasonable notice of Mr. Micheli's dangerous nature and the possibility that, if it failed to notify the relevant authorities after his abscondment, members of the public might be hurt.

Hope Village's only response to this argument is, once again, to debate the facts. Hope Village notes that the magistrate judge found Mr. Micheli "<u>competent</u> to face trial and ordered his pretrial release into a halfway house without even the need for electronic monitoring." Hope Village, Inc.'s Reply to Pl.'s Opp'n to Mot. to Dismiss ("Hope Village Reply") [ECF No. 23] at 7. It also argues that Mr. Micheli's friends and family could not have contacted Hope Village and placed it on notice of his dangerousness because "halfway house placements are not readily accessible by the public." <u>Id.</u> at 8. Again, however, these factual disputes are not to be resolved on a motion to dismiss. Even with some confusion as to the exact details, plaintiff's allegations are sufficient to survive the pleadings stage.

The Court thus concludes that plaintiff has sufficiently pled facts alleging that Hope Village behaved negligently in its failure to notify the relevant authorities of Mr. Micheli's abscondment. The Court will accordingly deny Hope Village's motion to dismiss as to Count 6 of the complaint.

## II.   Negligent Supervision and Failure to Train

Plaintiff brings claims of negligent supervision and training against Hope Village and the District. Compl. ¶¶ 49–56, 90–97. Under D.C. law, employers have a duty to "use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee." <u>Griffin v. Acacia Life Ins. Co.</u>, 925 A.2d 564, 575 (D.C. 2007) (per curiam) (quoting <u>Fleming v. Bronfin, Inc.</u>, 80 A.2d 915, 917 (D.C. 1951)). "When an employer neglects this duty and as a result injury is occasioned to a third person, the

employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment." Id. To state such a claim, a plaintiff must allege facts showing "that the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." Phelan v. City of Mount Rainier, 805 A.2d 930, 937–38 (D.C. 2002) (internal quotation marks omitted).[6]

Turning first to Hope Village, plaintiff alleges that the halfway house "had a duty to supervise the parties with whom it contracted to ensure that [those contractors] . . . detained persons within its custody" in accordance with various common law duties, "all applicable contracts," and "all applicable laws, regulations, and standards." Compl. ¶ 91. She argues that, based on its history of "premature releases and/or failed efforts to apprehend detainees," id. ¶¶ 13–17, Hope Village should have been on notice that its employees were incompetent, ill-trained, and (at base) a risk to the general welfare. Pl.'s Hope Village Opp'n at 16–17. Plaintiff contends that "[d]iscovery should be permitted to determine who allowed Mr. Micheli to leave Hope Village, whether this employee had made this mistake before, or alternatively, whether the employees were appropriately trained on when to permit a mentally unstable inmate into the community without supervision." Id. at 17.

The Court agrees that plaintiff alleges a plausible claim that Hope Village took inadequate steps to correct its employees' past failures. Plaintiff describes a series of past errors, including improperly releasing the detainee in Smith, who murdered a nine-year-old girl. Compl. ¶¶ 13–17. Plaintiff also notes that, in 2016 and 2017, Hope Village accounted for ten percent of instances

---

[6] The same principles apply in Tennessee. See Doe v. Catholic Bishop for the Diocese of Memphis, 306 S.W.3d 712, 717 (Tenn. Ct. App. 2008) ("[A] plaintiff in Tennessee may recover for negligent hiring, supervision or retention of an employee if he establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job.").

where detainees "failed to return at scheduled times," despite housing just three percent of the federal halfway house population.  Id. ¶ 15.  Plaintiff alleges that Hope Village "knew of the serial lapses" at its facility, "but took no steps to prevent repetition of those errors, endangering the public at large, and specifically, endangering Joel Paavola."  Id. ¶ 17.  Such allegations are sufficient at the pleadings stage to make out a claim for negligent supervision and training, because they present Hope Village as knowing that its employees "behaved in a dangerous or otherwise incompetent manner" but not taking adequate steps thereafter to train or supervise them.  Phelan, 805 A.2d at 937–38 (quotation omitted).

As for the District, the public duty doctrine again bars plaintiff's claim.  "[A]n action for negligent supervision and retention requires proof that the employer breached a duty to plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff."  Id. at 940.  The District owed no duty to plaintiff beyond its obligations to the public at large, see Klahr, 576 A.2d at 719, and none of the exceptions to this doctrine under D.C. law apply.  Cf. McGaughey v. District of Columbia, 684 F.3d 1355, 1358 (D.C. Cir. 2012) ("As the police have no duty to investigate any particular crime, they certainly have no enforceable duty arising from their management of the personnel who investigate the crime.").

Once again, then, the Court concludes that plaintiff has adequately pled a claim against Hope Village, but that the public duty doctrine shields the District from civil liability.  Accordingly, Count 2 will be dismissed, and Count 7 will be allowed to proceed.

### III.    Intentional Infliction of Emotional Distress

Plaintiff next brings two counts of intentional infliction of emotional distress against Hope Village and the District.  Compl. ¶¶ 62–65, 99–102.  To prove the tort of intentional infliction of emotional distress under D.C. law, "a plaintiff must show (1) extreme and outrageous conduct on

the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." Ortberg v. Goldman Sachs Grp., 64 A.3d 158, 163 (D.C. 2013) (internal quotation omitted).

D.C. "case law establishes strict tests for [these] elements." Id. To establish the requisite outrageousness, the plaintiff must demonstrate "conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Wood v. Neuman, 979 A.2d 64, 77 (D.C. 2009) (quotation omitted). Whether conduct is extreme and outrageous is a context-specific inquiry: "When evaluating 'context,' a court should examine 'not only . . . the nature of the activity at issue but also . . . the relationship between the parties, and the particular environment in which the conduct took place.'" Ortberg, 64 A.3d at 163 (quoting Estate of Underwood v. Nat'l Credit Union Admin., 665 A.2d 621, 641 (D.C. 1985) (internal quotation marks omitted)).

Here, plaintiff alleges no conduct by Hope Village or the District that is so outrageous or extreme as to make out a claim for intentional infliction of emotional distress. In terms of Hope Village, plaintiff alleges that it failed to "tak[e] steps to protect the public by correcting errors and mistakes" that had been plaguing the halfway house for years. Compl. ¶¶ 13–17, 80. She also alleges that Hope Village "failed to timely notify the appropriate authorities . . . of Mr. Micheli's conduct, escape, or 'absconded' status." Id. at ¶ 27; see also Pl.'s Hope Village Opp'n at 18 ("Hope Village had a longstanding history of negligent detention and delayed notifications after escapes, that it knew Mr. Micheli was dangerous, that it allowed Mr. Micheli to leave the premises without supervision, and that it failed to timely report his escape.").

Taken together, the allegations frame Hope Village as having fallen short of the mark, both in its responsibilities to improve facility standards after a spotty history of enforcement and in

failing to notify the relevant authorities of Mr. Micheli's abscondment.  But such mistakes and missteps do not rise to the level of extreme and outrageous conduct that allows a claim of intentional infliction of emotional distress to survive at the pleadings stage.  Cf., e.g., Daniels v. District of Columbia, 894 F. Supp. 2d 61, 68 (D.D.C. 2012) (not dismissing an intentional infliction of emotional distress claim where officers "pushed, shoved, and jerked" a woman even after being informed that she was pregnant and "willing to go peacefully"; swore at her; and "subjected her to an 'intentionally violent ride' to the precinct"); Liser v. Smith, 254 F. Supp. 2d 89, 106 (D.D.C. 2003) (not dismissing an intentional infliction of emotional distress claim where it was alleged "that Detective Smith and his fellow officers recklessly and intentionally fabricated facts in order to support his unjustified arrest and continued detention").  Cases involving missteps or mistakes are normally dismissed.  See Xingru Lin v. District of Columbia, Civil Action No. 16-645 (CKK), 2019 WL 1597876, at *15 (D.D.C. Apr. 15, 2019) (gathering examples).  The Court concludes that plaintiff's allegations fall in that latter camp.

Plaintiff responds that her allegations demonstrate a clear "history of negligent and erroneous releases of dangerous criminals," Pl.'s Hope Village Opp'n at 19, in essence, a history of recklessness both in Hope Village's general protocols and in its failure to inform the relevant authorities of Mr. Micheli's missteps.  Plaintiff does not claim that Hope Village intentionally caused her emotional distress through its actions; therefore, it is necessarily true that her intentional infliction of emotional distress claim must be based on recklessness.  But whether a defendant had the requisite state of mind is distinct from whether its conduct was extreme or outrageous—they are separate elements of the tort.  See Ortberg, 64 A.3d at 163.  Because the actions here are not of a sufficiently outrageous or extreme character to support plaintiff's claim, Count 8 against Hope Village must be dismissed even if the halfway house did act recklessly.

As to the District, plaintiff alleges that "D.C. Department of Corrections became aware that Mr. Micheli was not complying with the terms of the Release Order" but "failed to timely notify and/or failed to ever notify the appropriate parties[] of [his] actions" or "to take any steps to ensure that [he] was apprehended before he could harm" someone.  Compl. ¶ 30.  Again, plaintiff does not suggest that the District intended harm to Mr. Paavola or the public generally, but she does argue that "a defendant's continued negligence in the detention of dangerous offenders, in the face of prior warnings, is outrageous conduct."  Pl.'s District Opp'n at 22.

Like the claim against Hope Village, the District's alleged conduct does not rise to the requisite level of "extreme or outrageous" because its alleged actions were akin to missteps and mistakes.  Plaintiff cites cases wherein intentional infliction of emotional distress claims were based on continuous negligence, id., but the nexus between the defendants' conduct and the severe harm caused made the conduct in those cases much more outrageous and extreme than in this case. For example, in Arias v. DynCorp., Case No. 1:01cv01908 (ESH), 2016 WL 6496214 (D.D.C. Nov. 2, 2016), the court concluded that "DynCorp's decision to continue . . . missions spraying border communities in Ecuador for years after it was told that such spraying was causing harm aggravated what already amounts to troubling conduct" (i.e., "releas[ing] a fumigant that is harmful to humans, animals, and plants . . . onto plaintiffs' lands"), id. at *1, 10.  Plaintiff alleges no such clear and continuous warning for the District.  Rather, she alleges that Hope Village accounted for a disproportionately high rate of "failed . . . return[s] at scheduled times" and cites one instance from eighteen years ago when an improperly released detainee murdered a young girl.  See Compl. ¶¶ 14–17.  Based on such a record, the District's continued use of Hope Village was not so extreme or outrageous "as to go beyond all possible bounds of decency" or to be "utterly intolerable in a civilized community."  Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624,

628 (D.C. 1997) (quotation omitted).  Count 4 against the District thus will be dismissed.

## IV.   Due Process Claim

Plaintiff brings a separate due process claim against the District, alleging that "District of Columbia officials affirmatively acted to increase or create the danger that resulted in the Plaintiff['s] injuries."  Compl. ¶ 58.  In particular, she alleges that "the District took affirmative actions to cut funding and staffing for detention of inmates" and "enacted policies that were unsafe and entered into contracts that placed the Plaintiff[] (and the public) in danger."  Id. ¶ 59; see also Pl.'s District Opp'n at 25 ("[T]he District enacted policies to cut funding and staffing further, causing Mr. Micheli's escape from the District's custody to go unreported.").

Assuming that plaintiff has satisfied Rule 8's requirement that "the District [be] on notice of the statute under which [plaintiff] intend[s] to proceed,"[7] District Mot. at 23, her complaint nevertheless fails to allege facts demonstrating that the District violated plaintiff's constitutional rights.  "[T]he Due Process Clause 'generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or protect property interests of which the government itself may not deprive the individual.'"  Butera v. District of Columbia, 235 F.3d 637, 647 (D.C. Cir. 2001) (quoting DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 196 (1989) (first alteration added)).  But "an individual can assert a substantive due process right to protection by the District of Columbia from third-party violence when District of Columbia officials affirmatively act to increase or create the danger that ultimately results in the individual's harm."  Id. at 651.  The District's conduct must be "so egregious, so outrageous, that it may fairly

---

[7] The District argues that plaintiff failed to satisfy the requirements of Federal Rule of Civil Procedure 8 because she did not list the specific statute under which she brings her constitutional claim.  District Mot. at 22–23. Plaintiff clarifies in her briefing that her due process claim is brought under 42 U.S.C. § 1983.  See Pl.'s District Opp'n at 24–25.  Although the District has a point, this gap in plaintiff's complaint can easily be remedied through an amended pleading, and the Court focuses instead on the absence of sufficient facts to get plaintiff's constitutional claim off the ground.

be said to shock the contemporary conscience." Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams, 375 F.3d 1141, 1144 (D.C. Cir. 2004) (internal quotation omitted).

Plaintiff cites Butera v. District of Columbia to support her claim, a case involving the death of a police informant assisting law enforcement officials "by conducting [an] undercover drug purchase." 235 F.3d at 641–43. There, the D.C. Circuit concluded that, "[i]n view of the officers' duty to protect [the informant]," plaintiffs could prove that "the officers' treatment of him in connection with the attempted undercover drug buy 'shocked the conscience' by meeting the . . . threshold of 'deliberate indifference.'" Id. at 652. Central to the court's holding was the "heightened obligation" that the police officers had toward the informant, whom they placed in harm's way and, correspondingly, were charged with protecting. Id. at 651–52; see also Collins v. City of Harker Heights, 503 U.S. 115, 127–28 (1992) ("The 'process' that the Constitution guarantees in connection with any deprivation of liberty . . . includes a continuing obligation to satisfy certain minimal custodial standards.").

But this exception has its limits. The D.C. Circuit has declined to extend Butera's so-called "State endangerment" theory to instances of general policymaking. For instance, the D.C. Circuit has consistently rejected correctional officers' substantive due process claims based on decisions about jail population and staffing. See, e.g., Fraternal Order, 375 F.3d at 1142–43, 1145–46 (rejecting a due process claim by the correctional officers' union based on alleged danger resulting from increase in D.C. Jail population alongside a decrease in the number of officers); Washington v. District of Columbia, 802 F.2d 1478, 1479 (D.C. Cir. 1986) (concluding "that the reckless failure of state officials to remedy unsafe prison conditions does not deprive a prison guard of a liberty interest secured by the Fourteenth Amendment").

Here, plaintiff's claims come much closer to those of the prison guards in Fraternal Order

and <u>Washington</u> than to the undercover informant in <u>Butera</u>. Plaintiff does not allege that Mr. Paavola stood in any special relationship to the District, and the few affirmative acts that plaintiff does allege—"cut[ting] funding and staffing for detention of inmates," "enact[ing] policies that were unsafe," and "enter[ing] into contracts," Compl. ¶ 59—are almost identical to the actions taken by D.C. officials in <u>Fraternal Order</u>, which the D.C. Circuit concluded would <u>not</u> violate due process, <u>see</u> 375 F.3d at 1145–46.

Plaintiff suggests that the District should have known better because "the District mismanaged inmates in [its] custody for more than a decade," Pl.'s District Opp'n at 25, and knew of "the serial lapses" at Hope Village. Compl. ¶¶ 13–17. But budgetary and other policymaking decisions, even in the face of data suggesting an increased risk of danger, "in no way approach the cognizable level of executive abuse of power as that which shocks the conscience." <u>Fraternal Order</u>, 375 F.3d at 1145 (internal quotation marks omitted); <u>see also</u> <u>id.</u> (declining to extend <u>Butera</u> where officials allegedly failed to heed a "court-ordered inmate population ceiling," an "internal DOC staffing memorandum allegedly indicating a need for more correctional officers," a "National Institute of Occupational Safety and Health report identifying health hazards at the Jail," and a "rise in the number of inmate assaults on correctional officers"). Under the D.C. Circuit's precedents, then, plaintiff fails to state a claim under the due process clause, and Count 3 against the District must be dismissed.

## V.      Breach of Contract Claim

In addition to her tort claims, plaintiff brings a breach-of-contract claim against all three defendants. Compl. ¶¶ 104–06. She alleges that Mr. Micheli was confined at Hope Village based on contracts between the United States and the District, the United States and Hope Village, and the District and Hope Village. <u>Id.</u> ¶ 104. "These contracts were entered into to protect the public,"

plaintiff alleges, "and contained specific provisions and requirements to ensure that the public was protected from inadequate supervision of pretrial detainees, premature release, and/or failure to take the appropriate steps to apprehend pretrial detainees who did not comply with court orders." Id. ¶ 105.  Because Mr. Paavola and his family "were members of the public who were third-party beneficiaries of these contracts," plaintiff argues that she should be able to recover both economic and non-economic damages arising from "[d]efendants' individual and collective failure to adhere to the terms of the contracts."  Id. ¶ 106.

Plaintiff fails to allege sufficient facts to demonstrate that she has third-party standing to enforce these contracts.  She is correct that parties to a contract can create duties enforceable by third-party beneficiaries.  See Restatement (Second) of Contracts § 304 (1981) ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty.").  But under both D.C. and Tennessee law, "third party beneficiaries of a Government contract are generally assumed to be merely incidental beneficiaries, and may not enforce the contract absent clear intent to the contrary."  Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1065 (D.C. 2008) (first emphasis added) (internal quotation omitted); Coburn v. City of Dyersburg, 774 S.W.2d 610, 612 (Tenn. Ct. App. 1989) ("Every contract into which a governmental entity enters is made for the benefit of all its citizens.  Only when such a contract manifests a specific intent to grant individual citizens enforceable rights thereunder may a citizen claim such rights as a third-party beneficiary.").

Plaintiff fails to allege sufficient facts demonstrating that any of the three contracting parties—here, the defendants—intended to grant Mr. Paavola individually enforceable rights above and beyond the incidental benefits accruing to the public generally.  She alleges that she and

her family "were members of the public who were third-party beneficiaries of these contracts" and that "[t]hese contracts were entered into to protect the public," Compl. ¶¶ 105–06, but these allegations show only that Mr. Paavola and his family were part of the broader public incidentally benefited by these contracts, see also id. ¶ 105 (noting that the contracts "contained specific provisions and requirements to ensure that the public was protected" (emphasis added)). "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." Moore v. Gaither, 767 A.2d 278, 287 (D.C. 2001) (internal quotation omitted).[8]

Plaintiff cites Phillips v. Fed. Bureau of Prisons, 271 F. Supp. 2d 97 (D.D.C. 2003), for the proposition that "resolution of a breach of contract claim is not appropriate at the motion to dismiss stage when the contract is not before the Court." Pl.'s District Opp'n at 24; see also Pl.'s Hope Village Opp'n at 20. But Phillips concerned a suit by the estate of an inmate housed at Hope Village who was shot during his residency, and the district court's decision to allow that case to proceed past the pleadings stage turned on whether the contracts implicated a federal interest and established subject-matter jurisdiction, not whether the plaintiff's complaint stated a cause of action. See 271 F. Supp. 2d at 99, 102. As a resident of Tennessee, plaintiff here is at several removes from an inmate housed at Hope Village, and Phillips provides little help in determining whether her conclusory allegations set out sufficient factual support for her breach-of-contract claim.

In sum, Count 9 against all three defendants must be dismissed.

---

[8] Both the United States and the District have submitted copies of various contracts as evidence of the absence of specific provisions conferring benefits on plaintiff as an individual, rather than a member of the public. See Def. District of Columbia's Reply to Pls.' Opp'n to Def. District of Columbia's Mot. to Dismiss [ECF No. 24] at 17–18; U.S. Reply at 2–3. Because the Court concludes that plaintiff has failed to allege sufficient facts to support her breach-of-contract claim, it need not wade into these documents and can conclude, as a matter of law, that plaintiff has failed to state a claim for relief as a third-party beneficiary to the various government contracts.

## VI.     Punitive Damages

Finally, the Court considers whether punitive damages can be awarded on the two remaining claims against Hope Village, wrongful death and negligent supervision and failure to train.   "Punitive damages are warranted only when the defendant commits a tortious act accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury."  Wash. Med. Ctr., Inc. v. Holle, 573 A.2d 1269, 1284 (D.C. 1990) (internal quotation marks omitted).  Hope Village argues that the allegations against it "do[] not rise to the level of wantonness required for imposition of punitive damages."  Hope Village Mot. at 16–17.  But an award of punitive damages does not require wantonness; recklessness will do.

Under D.C. law, recklessness is defined as "conscious indifference to the consequences of [one's] behavior."  In re Anderson, 778 A.2d 330, 339 (D.C. 2001).  Plaintiff alleges exactly such a state of mind here, claiming that Hope Village's "failures led to premature releases and/or failed efforts to apprehend detainees," that Hope Village "took no steps to prevent repetition of these errors," and that it "failed to timely notify the appropriate authorities" despite the known risk that Mr. Micheli posed to the public. Compl. ¶¶ 13–17, 27.  Plaintiff may have a hard time establishing recklessness, but given these allegations, it is not appropriate at this time to dismiss plaintiff's claim to punitive damages.

### Conclusion

For all the foregoing reasons, the motions to dismiss filed by the United States and the District of Columbia will be granted in whole, and the motion to dismiss filed by Hope Village will be granted in part and denied in part.  Accordingly, plaintiff's individual claims as to the United States and the District of Columbia (Counts 1–5) will be dismissed.  Moreover, plaintiff's

claims of intentional infliction of emotional distress against Hope Village and breach of contract against all three defendants (Counts 8–9) will also be dismissed.  A separate order will be issued on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  <u>April 29, 2020</u>