## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LANA M. PAAVOLA, individually and as
Administrator of the ESTATE OF JOEL D.
PAAVOLA, deceased,

     **Plaintiff,**

     **v.**

HOPE VILLAGE,

     **Defendant.**

**Civil Action No. 19-1608 (JDB)**

### MEMORANDUM OPINION

Plaintiff Lana Paavola, individually and on behalf of the estate of her late husband Joel D. Paavola and his beneficiaries, sued Hope Village, Inc. ("Hope Village") for its alleged role in her husband's tragic death. Plaintiff now contends that Hope Village spoliated evidence and seeks sanctions, including an adverse inference instruction at trial and an award of attorneys' fees and costs. While the Court does find that Hope Village was grossly negligent in failing to preserve evidence, for the reasons explained below, the Court will deny plaintiff's motion without prejudice and allow her to file a new motion based on a more fully developed record.

### Background

Domenic Micheli was arrested for trespassing at the White House on April 27, 2018. Am. Compl. [ECF No. 52] ¶ 37. He told the Secret Service he was the President of the United States and that he had come to Washington, D.C. to lead the nation. Id. Micheli was temporarily detained at the D.C. jail but ultimately released by a magistrate judge to the D.C. Department of Corrections ("DOC") for placement in a halfway house. Id. ¶¶ 40, 42. On May 15, 2018, Micheli checked

into the Hope Village halfway house in Washington, D.C.  Id. ¶ 45.  Micheli absconded from the facility on May 23, 2018.  Id. ¶ 53.  He then traveled to Nashville, Tennessee, where he murdered his former employer and plaintiff's husband, Joel Paavola, on June 4, 2018.  Id. ¶¶ 57–60.

On September 26, 2018, plaintiff sent a demand letter to Hope Village, stating her intent to file wrongful death, survival, and negligence claims based on its failure to secure Micheli and to timely notify authorities of his escape.  Pls.' Mot. for Sanctions ("Mot.") [ECF No. 54] at 2; Pls.' Demand Letter (Sept. 26, 2018) [ECF No. 21-1] at 1.  Upon receipt of that letter, Hope Village instituted an oral litigation hold.  Ex. B to Mot. ("Interrog. Resps.") [ECF No. 54] at 3 ¶ 2.  CEO Jeffrey Varone was charged with effectuating the hold and advised Administrative Director Joseph Wilmer of the hold as well.  Id. at 3 ¶ 3.  Hope Village then "secured [the] documents [it] believed to be relevant to the lawsuit."  Id. at 3 ¶ 4.  On June 3, 2019, plaintiff filed negligence and negligent supervision claims against Hope Village.  See Compl. [ECF No. 1] ¶¶ 13, 80, 92.  Specifically, she alleged that Hope Village had been negligent in managing, supervising, and securing its residents, and in training and supervising its employees.[1]  Id.

The Hope Village facility permanently closed on April 30, 2020.  Def.'s Opp'n to Mot. ("Opp'n") [ECF No. 58] at 7.  About a month later, the Court held an initial scheduling conference, and the parties proceeded to discovery.  See Min. Entry (June 9, 2020).  In response to plaintiff's document requests, Hope Village later informed plaintiff that it could not locate several records because "[i]n the days leading up to the close of the facility, staff discarded confidential personnel files, returned portions of resident files to the contracting authority and disposed of documents generated by staff that remained part of the resident files."  Interrog. Resps. at 3–4 ¶ 5.

---

[1] Plaintiff originally sued the United States and the District of Columbia as well.  Compl. ¶ 1.  On April 29, 2020, the Court dismissed under Rule 12(b)(6) all of plaintiff's claims against those defendants, as well as plaintiff's intentional infliction of emotional distress and breach of contract claims against Hope Village.  See Paavola v. United States, 459 F. Supp. 3d 21, 46 (D.D.C. 2020).

On February 11, 2021, plaintiff filed a motion seeking sanctions for three categories of lost evidence: (1) staff records—specifically, "staff quarterly schedules including staff vacancies" from April 27, 2018 through June 5, 2018, training records, and four employees' personnel files; (2) escape and absconsion records from June 2017 through June 2018; and (3) security records—specifically, "daily population counts for customer agencies[,] . . . security log books[,] and facility daily count sheets" from April 27, 2018, through June 5, 2018.  Mot. at 3–4.  Plaintiff requests an instruction at trial that the jury may infer from Hope Village's destruction of evidence "that the evidence was unfavorable to Hope Village."  Id. at 5–7.  She also seeks attorneys' fees and costs for the work required to subpoena documents from DOC and to bring this motion.  Id. at 7–8.  The motion has been fully briefed and is ripe for consideration.[2]

### Legal Standard

A district court "has inherent power to sanction abuses of the judicial process, including discovery abuses."  Mannina v. Dist. of Columbia, 437 F. Supp. 3d 1, 6 (D.D.C. 2020) (citing

---

[2] On August 17, 2021, plaintiff moved for leave to file a supplemental memorandum in support of her motion for sanctions.  See Pls.' Mot. for Leave to File Suppl. Mem. in Supp. of Pls.' Mot. for Sanctions [ECF No. 91].  The memorandum states that "depositions led to the discovery of multiple categories of new documents, relevant to Plaintiffs' claims, that Defendant destroyed," see Pls.' Suppl. Mem. in Supp. of Pls.' Mot. for Sanctions [ECF No. 91-1] at 1, and seeks sanctions with respect to those new documents.  Because plaintiff's supplemental memorandum suffers from the same deficiencies as the instant motion, the Court will deny without prejudice plaintiff's motion for leave to file a supplemental memorandum.  Plaintiff may include her new allegations in a separate motion that addresses the concerns identified by the Court in this Memorandum Opinion.

For its part, without seeking leave of the Court, and before plaintiff had been granted leave to file a supplemental memorandum, Hope Village filed its own supplemental memorandum on August 30, 2021, responding to the arguments raised in the supplemental memorandum that plaintiff sought leave to file.  See Def.'s Suppl. Mem. in Supp. of Opp'n to Pls.' Mot. for Sanctions [ECF No. 94].  Hope Village's supplemental memorandum also contains some new information in support of its opposition brief—namely, deposition testimony that Hope Village disposed of all DOC-related documents in an effort to comply with its contractual obligations with DOC.  See id. at 2.  Because this testimony does not affect the Court's finding that Hope Village was grossly negligent with respect to its preservation duties in this case, the Court determines that the proper course is to strike Hope Village's entire supplemental memorandum from the record.  Hope Village will have the opportunity to renew any of its arguments against plaintiff's supplemental memorandum if plaintiff files another sanctions motion.

<u>Shepherd v. Am. Broad. Cos., Inc.</u>, 62 F.3d 1469, 1474–75 (D.C. Cir. 1995)).[3]  "A party that fails to preserve evidence 'runs the risk of being justly accused of spoliation'—defined as 'the destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation'—and find itself the subject of sanctions."  <u>Zhi Chen v. Dist. of Columbia</u>, 839 F. Supp. 2d 7, 12 (D.D.C. 2011) (quoting <u>D'Onofrio v. SFX Sports Group, Inc.</u>, Civ. A. No. 06-687 (JDB/JMF), 2010 WL 3324964, at *5 & n.5 (D.D.C. Aug. 24, 2010)).  A court "'may impose issue-related sanctions,' such as an adverse inference instruction, 'whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of [an] issue.'"  <u>Id.</u> (quoting <u>Shepherd</u>, 62 F.3d at 1478); <u>see also</u> <u>Gerlich v. U.S. Dep't of Just.</u>, 711 F.3d 161, 170 (D.C. Cir. 2013) ("This court has recognized that a negative inference may be justified where the defendant has destroyed potentially relevant evidence.").  To impose punitive sanctions—such as attorneys' fees or costs—the court must find clear and convincing evidence of misconduct.  <u>Mannina</u>, 437 F. Supp. 3d at 6 (citing <u>Shepherd</u>, 62 F.3d at 1478).

---

[3] Rule 37 also gives courts the authority to impose sanctions in two different situations, neither of which apply here.  Section (b)(2) "authorizes a court to assess a sanction for violation of a discovery order."  <u>Webb v. Dist. of Columbia</u>, 146 F.3d 964, 971 (D.C. Cir. 1998).  Because the documents at issue here were destroyed before discovery began, the Court agrees with the parties that Rule 37(b)(2) does not control.  <u>See</u> <u>Clarke v. WMATA</u>, 904 F. Supp. 2d 11, 20 n.6 (D.D.C. 2011); <u>see also</u> <u>Att'y Gen. of U.S. v. Irish People, Inc.</u>, 684 F.2d 928, 951 n.129 (D.C. Cir. 1982) ("A production order is generally needed to trigger Rule 37(b).").

Rule 37(e), in turn, applies when "electronically stored information ['ESI'] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery."  Fed. R. Civ. P. 37(e).  The Advisory Committee Note to the 2015 Amendment to Rule 37(e) explains that the Rule "authorizes and specifies measures a court may employ if information that should have been preserved is lost . . . [and] therefore forecloses reliance on inherent authority."  Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.  Neither party argues that Rule 37(e) governs here.  And although plaintiff broadly notes that Hope Village erased both paper and electronic files when the facility closed, <u>see</u> Mot. at 5, most of the materials at issue in the motion, such as "personnel files," "daily count sheets," and "security log books," clearly sound like traditional paper files.  Absent any suggestion to the contrary, the Court does not understand any of the "documents" at issue in this motion to be ESI and thus will not consider sanctions under Rule 37(e).  Instead, the Court will evaluate plaintiff's motion as if it pertains exclusively to non-ESI.

When assessing the appropriate sanction, a "court must properly calibrate the scales to ensure that the gravity of an inherent power sanction corresponds to the misconduct." Shepherd, 62 F.3d at 1479 (quotation omitted). And "such authority 'must be exercised with restraint and discretion,'" Borum v. Brentwood Village, LLC, 332 F.R.D. 38, 44 (D.D.C. 2019) (quoting Young v. Off. Of U.S. Senate Sergeant at Arms, 217 F.R.D. 61, 65 (D.D.C. 2003)), to "reflect our judicial system's strong presumption in favor of adjudications on the merits," Shepherd, 62 F.3d at 1475.

## Analysis[4]

### I.    Adverse Inference Sanction

To award an adverse inference instruction, a court must find that:

> (1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind"; and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defense of the party that sought it.

Mazloum v. D.C. Metro. Police Dep't, 530 F. Supp. 2d 282, 291 (D.D.C. 2008) (quoting Thompson v. HUD, 219 F.R.D. 93, 101 (D. Md. 2003)); see also Mannina, 437 F. Supp. 3d at 6. The moving party bears the burden of demonstrating that sanctions are warranted. Borum, 332 F.R.D. at 43. The Court will address each prong of the Mazloum test in turn.

---

[4] Courts may award several types of sanctions pursuant to their inherent authority. These include attorneys' fees and costs, contempt citations, disciplinary sanctions, adverse inference instructions, orders precluding the admission of evidence, and default judgments. See Shepherd, 62 F.3d at 1475 (citing Gregory P. Joseph, Sanctions: The Federal Law of Litigation Abuse § 28(A) (2d ed. 1994)). Although this Court has an independent obligation to determine the most appropriate type of sanction based on the facts presented, see id. at 1479, for the purposes of assessing the instant motion, which will be denied without prejudice, the Court will evaluate only the specific sanctions discussed by the parties: an adverse inference instruction and an award of attorneys' fees and costs.

### A. Duty to Preserve Evidence

A party "has a duty to preserve 'what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.'" Mannina, 437 F. Supp. 3d at 11 (quoting Mahaffey v. Marriot Int'l, Inc., 898 F. Supp. 2d 54, 60 (D.D.C. 2012)). At this stage of the inquiry, evidence is considered "relevant" if it "bears on the 'claims or defenses of any party.'" Id. (quoting Zubulake v. UBS Warburg LLC ("Zubulake IV"), 220 F.R.D. 212, 218 (S.D.N.Y. 2003)). Hope Village does not deny that this lawsuit was foreseeable as early as September 26, 2018, when plaintiff issued her demand letter, or that it disposed of the specific documents at issue in this motion. Instead, Hope Village contends that it had no duty to preserve those documents because it had no reason to believe that they were "relevant" to plaintiff's case. See Opp'n at 2–8.

Since the documents in question were destroyed well after plaintiff filed her complaint, Mot. at 2, the Court will look to the contents of the complaint to assess foreseeability, as Hope Village concedes is appropriate. See, e.g., Opp'n at 1, 5 (evaluating foreseeability based on allegations in the complaint); see also Borum, 332 F.R.D. at 45 ("At the very least, the duty [to preserve evidence] begins no later than the date the lawsuit is filed."). Based on the complaint, the Court cannot credit Hope Village's assertions that it could not have reasonably foreseen that the records at issue here would be relevant to plaintiff's claims.

To begin, the staff records, including staff schedules, training materials, and employee personnel files, plainly bear upon both plaintiff's negligence and negligent training claims. See Compl. ¶¶ 78–97. The staff schedules would not only establish which employees were working when Micheli absconded, but also reflect the degree to which Hope Village was adequately staffed,

which relates to plaintiff's allegations that the facility failed "to control access to and egress from the facility" and to "maintain continuous accountability of all detainees." See id. ¶¶ 83, 93. Training records would shed light on plaintiff's assertions that "Hope Village breached its duties by not training its employees to manage inmate detention appropriately, to report escapes, and/or to recapture escaped inmates." See id. ¶ 92. And personnel files for employees who worked at Hope Village in the days surrounding Micheli's escape would reveal the employees' credentials, training, and performance, which would inform plaintiff's negligent supervision and training claims. See id. Indeed, in her response to Hope Village's motion to dismiss—filed over nine months before Hope Village discarded the materials at issue—plaintiff foreshadowed that she would request many of these very documents, asserting: "[d]iscovery should be permitted to determine who allowed Mr. Micheli to leave Hope Village, whether this employee had made this mistake before, or alternatively, whether the employees were appropriately trained on when to permit a mentally unstable inmate into the community without supervision." Pls.' Opp'n to Def. Hope Village's Mot. to Dismiss [ECF No. 21] at 17. It is implausible, then, that Hope Village did not know plaintiff would request such records in discovery.

Hope Village resists this straightforward analysis, arguing that the requested staff records are irrelevant because plaintiff "has not alleged that any employee failed to report Micheli's abscondsion[,] that there has been any history of failure to report absconsions," or that "Hope Village was responsible for recapturing residents who escaped or absconded." Opp'n at 7. Hope Village also asserts that personnel files would not reveal understaffing problems or any incidents of employee malfeasance warranting termination, given that "all the employees at issue were still employed with Hope Village when the facility closed." Id. at 8.

Even assuming <u>arguendo</u> that these propositions are true,[5] none affects the outcome here. Plaintiff's complaint levies many allegations.  Hope Village's arguments simply focus on some allegations while ignoring others.  A record need not bear on <u>every</u> allegation in the complaint to qualify as relevant, and the standard for relevance—at this stage—does not hinge on whether a document would be favorable, or even important, to plaintiff's case.  Hence, the Court finds that Hope Village had a duty to preserve the requested staff records, including staff schedules, training materials, and personnel files, because it "reasonably should [have] know[n]" from the complaint that those materials were "relevant in th[is] action."  <u>See</u> <u>Mannina</u>, 437 F. Supp. 3d at 11 (quoting <u>Mahaffey</u>, 898 F. Supp. 2d at 60).

The relevance of the second and third categories of records is clear as well.  Escape and absconsion documents from June 2017 to June 2018 bear upon plaintiff's allegation that Hope Village failed "to take appropriate action to remedy serial and continued lapses in oversight and management of the pretrial detention services it provided."  Compl. ¶ 81(f).  While Hope Village maintains that "the specific circumstances of each escape or abscondence" are nonetheless "immaterial" to this allegation, <u>see</u> Opp'n at 5, the Court is not persuaded.  Records detailing each incident would undoubtably illuminate Hope Village's knowledge of security lapses at its facility and whether Hope Village had taken adequate steps to rectify those issues.

Finally, population counts, daily count sheets, and security logbooks are relevant to plaintiff's allegation that Hope Village failed "to appropriately monitor, supervise, and secure pretrial detainees" and "to maintain continuous accountability of all detainees."  <u>See</u> Compl. ¶¶

---

[5] Hope Village's proposition that personnel files would not reveal any incidents of employee malfeasance warranting termination because no employees were, in fact, terminated puts the cart before the horse.  Indeed, evidence that Hope Village had responded inadequately to incidents of malfeasance—such as by not terminating an employee— might substantiate plaintiff's claim that Hope Village failed "to take appropriate action to remedy serial and continued lapses in oversight and management of the pretrial detention services it provided."  <u>See</u> Compl. ¶ 81(f).

81(a), 83(c), 85.  Hope Village once again dismisses the relevance of these materials, stating that plaintiff has not alleged that "inadequate counts led to Micheli's abscondence or that his absence from the facility was not discovered."  Opp'n at 3 (citing Compl. ¶¶ 4, 27).  But common sense dictates that records—such as security inspection logs and resident count sheets—documenting how Hope Village monitored residents in the period surrounding Micheli's escape bear upon plaintiff's allegations that Hope Village was not adequately tracking and securing residents.

In sum, the Court finds that Hope Village had a duty to preserve all three categories of records at the time the evidence was discarded.

### B.  Culpable State of Mind

Next the Court must consider whether Hope Village discarded evidence with a "culpable state of mind."  Mazloum, 530 F. Supp. 2d at 291.  Courts in this District have held that "[t]o justify the issuance of an adverse inference instruction, the spoliation of evidence need not be 'purposeful' . . . ; negligent spoliation may suffice."  Chen, 839 F. Supp. 2d at 13; see also Mannina, 437 F. Supp. 3d at 12 ("A party may have a 'culpable state of mind' that would support a finding of potentially sanctionable spoliation even if the party did not act in bad faith or purposefully destroy records.").  Here, plaintiff asks this Court to find gross negligence based solely on Hope Village's failure to institute a written litigation hold.  Mot. at 5.

At the outset, the Court agrees with Hope Village that the absence of a written hold is not dispositive.  See Opp'n at 8.  "Parties may determine how best to meet their preservation duties, based on the scope of the lawsuit and the sources of relevant evidence."  Mannina, 437 F. Supp. 3d at 12–13.  So while the failure to issue a written litigation hold "is relevant to the court's consideration, . . . it is not per se evidence of sanctionable conduct."  Haynes v. Dart, Civ. A. No. 08 C 4834, 2010 WL 140387, at *4 (N.D. Ill. Jan. 11, 2010) (citation omitted).

But the problem for Hope Village is that after instituting an oral litigation hold in response to plaintiff's demand letter and securing some limited files, it seems to have taken <u>no</u> further steps to comply with its preservation duties upon receipt of plaintiff's complaint, and instead engaged in a large-scale effort to discard files months after the litigation began.  For instance, Hope Village explains that following the demand letter, it "secured documents believed to be relevant to the lawsuit, including Micheli's resident file, technical proposals submitted for contract competition, contracts and amendments thereto, facility certifications, [and] policies and procedures manuals." Interrogs. Resps. at 3 ¶¶ 1–4.  Hope Village has not identified the precise scope of its oral hold— providing only this laundry list of secured documents.  And perhaps this limited hold was a reasonable response to the contents of plaintiff's three-page letter, although the Court harbors some doubts.  Even so, Hope Village has put forward <u>no</u> evidence that it then secured any additional documents or modified the scope of the oral hold after plaintiff filed her twenty-five page complaint on June 3, 2019, notwithstanding the heightened specificity of the complaint and the inclusion of a negligent supervision and training claim that was not identified in the demand letter. <u>See</u> Pls.' Demand Letter (Sept. 26, 2018) (stating plaintiff's intent to file wrongful death, survival, and negligence claims against Hope Village).  And thus, to the extent that Hope Village staff were operating under any retention policy when they discarded files in April 2020, there is no suggestion by Hope Village that it was a policy based on plaintiff's complaint.[6]

This conduct warrants not merely a finding of negligence, but of gross negligence.  "Gross negligence implies an 'extreme departure from the ordinary standard of care.'" <u>Wager v. Pro</u>, 603 F.2d 1005, 1010 (D.C. Cir. 1979) (quoting W. Prosser, <u>Law of Torts</u> § 8, at 184 (1971)).  Courts

---

[6] Of course, there would be no problem if the original oral hold did, by chance, align with the scope of the complaint's allegations.  But as the loss of relevant evidence reveals (and as the very limited list of documents mentioned by Hope Village suggests, <u>see</u> Interrogs. Resps. at 3 ¶¶ 1–4), the original hold did not.

in this District have found gross negligence where a party failed to take any steps to preserve certain relevant evidence, or even to consider aspects of the party's preservation duties well into the litigation process—as Hope Village has failed to do here. Cf. Chen, 839 F. Supp. 2d at 14 (finding defendant was grossly negligent in destroying evidence where "[t]here [was] no evidence, and no claim  by [defendant], that [defendant's] counsel or management ever took any steps to discuss the company's obligations to preserve evidence with [employees]"); Beck v. Test Masters Educ. Servs., Civ. A. No. 04-1391 (JDB), 2012 WL 10817176, at *5 (D.D.C. Sept. 25, 2012) (finding that a "lackluster effort" to comply with preservation duties, which may have included no effort to preserve certain files, "constitute[d] a conscious disregard of [defendant's] preservation obligations that c[ould] fairly be described as gross negligence"); Borum, 332 F.R.D. at 46, 49 (finding defendant's use of an oral litigation hold for the first two years of the litigation "completely incongruous to the expected norms that govern a party's duty to preserve evidence during litigation" and thus grossly negligent).

Moreover, the evidence here was not discarded through a routine or automatic process. Instead, Hope Village organized a specific effort to shred documents and dispose of records while it was actively engaged in litigating this case. Cf. Vasser v. Shulkin, Civ. A. No.:14-0185 (RC), 2017 WL 5634860, at *6 (D.D.C. Nov. 22, 2017) (destruction of evidence was negligent where records were destroyed pursuant to defendant's typical retention schedule).[7]  While it may have

---

[7] Indeed, there is some indication in the record that Hope Village's spoliation occurred after the Court issued its April 29, 2020 decision resolving Hope Village's motion to dismiss and highlighting some of the allegations in the complaint to which the discarded evidence directly pertains.  See Mem. Op. (Apr. 29, 2020) [ECF No. 38] at 20 ("One aspect of [Hope Village's duty of] 'reasonable care' is to prevent dangerous detainees from absconding."); id. at 23 (discussing plaintiff's allegation that "Hope Village should have been on notice that its employees were incompetent [and] ill-trained" based on a "history of 'premature release and/or failed efforts to apprehend detainees'" (quoting Compl. ¶¶ 13–17)); id. at 24 (discussing plaintiff's allegation that Hope Village "'knew of the serial lapses' at its facility, 'but took no steps to prevent repetition of those errors'" (quoting Compl. ¶ 17)).  To be sure, the record is not crystal clear on this point.  Hope Village originally attested that the documents were disposed of "after the facility closed on April 30, 2020." Req. for Produc. Resps. ¶¶ 17, 22, 51–52, 54.  But three months later Hope Village changed its tune, stating that the documents were discarded "[i]n the days leading up to the close of the facility."  Interrog.

had some legitimate motives for doing so—i.e., to pack up its facility or, in some instances, to fulfill its contractual obligations—those motives do not justify a complete disregard of its preservation duties in this case.[8]

A few other facts are troubling to the Court.  Hope Village not only discarded multiple categories of relevant documents months into this litigation, but also appears to have selectively retained certain files in a manner that contradicts its current narrative of events.  For instance, although Hope Village states that it could not have known that employee files and training records were relevant to this litigation—a remarkable claim given that plaintiff's suit challenges Hope Village's supervision and training of its employees—Hope Village did save and produce some employee scheduling records and training files.  See Req. for Produc. Resps. ¶¶ 15, 17 (discussing production of some training materials); Opp'n at 7 (discussing production of some staffing schedules and training records).  Hope Village has offered no explanation for why it kept certain files but not others.  The same concern arises with respect to Hope Village's treatment of forms detailing escapes and abscondions.  Despite its current position that it could not have foreseen the relevance of such forms, Hope Village chose to preserve three forms for the requisite time period while discarding all other similar forms.  See Mot. at 4; Opp'n at 5.  Although the Court does not know exactly how many forms were discarded, during the relevant time period Hope Village reported forty-eight escape and abscondion incidents to DOC (and likely others to additional

---

Resps. ¶ 5.  While the Court lacks sufficient evidence to credit either timeline, the point remains that, well after the litigation was actively underway, Hope Village discarded materials it knew or should have known were relevant.

[8] The Court also rejects Hope Village's contention that it was reasonable to discard employee files "to ensure that confidential documents, including [social security numbers] and home addresses would not get in the wrong hands if the closed facility were burglarized."  Opp'n at 7.  There are several other steps Hope Village could have taken to address confidentiality concerns, none of which required destroying evidence.  For example, Hope Village might have redacted copies of documents, moved the documents to a different location, or secured the documents in a locked area.

customer agencies), suggesting the number is quite large.  See Mot. at 4; Ex. D to Mot. ("DOC Production") [ECF No. 54].

Perhaps there is some logic to how Hope Village handpicked certain records to save within the three categories of documents at issue here, but none has been presented to the Court.  Instead, the record suggests that Hope Village was, at best, haphazard in carrying out its litigation hold and, at worst, inappropriately making judgments about which relevant materials to keep.  To be sure, the record is too sparse at this juncture to support a finding that Hope Village acted in bad faith.  But Hope Village's sole defense—that it could not have foreseen the relevance of any of these categories of materials—does give the Court some pause, given that Hope Village decided to preserve a select number of documents within those very categories.

In sum, based on "the overwhelming evidence of [Hope Village's] cavalier attitude toward its discovery obligations," the Court finds that Hope Village's destruction of evidence was grossly negligent.  See Chen, 839 F. Supp. 2d at 14.  Accordingly, Hope Village acted with a "culpable state of mind" sufficient to warrant an adverse inference instruction.

### C. Relevance

Under the third prong of the Mazloum test, the Court must examine whether the lost evidence is "relevant" to plaintiff's claims.  Mazloum, 530 F. Supp. 2d at 291.  The meaning of "relevance" at this stage of the inquiry is different than it was under the first prong of Mazloum.  Here, plaintiff must make some showing that the missing "evidence would have been favorable to [her]."  Chen, 839 F. Supp. 2d at 14 (quoting Zubulake v. UBS Warburg LLC ("Zubulake V"), 229 F.R.D. 422, 431 (S.D.N.Y. 2004)).  Of course, whether the evidence was "in fact" favorable "is an issue of fact to be determined by the jury."  Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 109 n.4 (2d Cir. 2002).  So, "the final element of relevance" only requires the

court to decide "whether a reasonable trier of fact could infer that the destroyed . . . evidence would have been of the nature alleged by the party affected by its destruction." Bolger v. Dist. of Columbia, 608 F. Supp. 2d 10, 32 (D.D.C. 2009) (alteration in original) (internal quotation marks and citation omitted); see also Residential Funding Corp., 306 F.3d at 109 n.4 ("[A] court's role in evaluating the 'relevance' factor in the adverse inference analysis is limited to insuring that the party seeking the inference ha[s] adduced enough evidence of the contents of the missing materials such that a reasonable jury could find in its favor.").

As the D.C. Circuit has acknowledged, assessing the relevance of lost evidence is "unavoidably imperfect" because "in [its] absence . . . a court can only venture guesses . . . as to what that missing evidence may have revealed." Gerlich, 711 F.3d at 171 (cleaned up). For this reason, the moving party need only make "a very slight showing" that the documents would have been favorable. Shealayno'sun v. McCarthy, No. 18-CV-0746 (APM), 2021 WL 39620, at *8 (D.D.C. Jan. 5, 2021) (quoting Ritchie v. United States, 451 F.3d 1019, 1025 (9th Cir. 2006)). For example, the movant may demonstrate the favorability of a lost record by "establishing that the [record] addressed topics, or falls into categories of documents, that would be favorable to [her] case." Beck, 2012 WL 10817176, at *6 (citation omitted).

Here, the Court finds that the relevance standard is satisfied with respect to the second category documents at issue, the forms detailing escapes and abscondions. These documents—three of which plaintiff has already obtained—include "narratives describing the events surrounding each escape or abscondion" from Hope Village. Reply at 3 n.12. Because these narratives would have demonstrated Hope Village's knowledge of security weaknesses at its facility, a reasonable jury could infer that the forms would have been favorable to plaintiff's case.

14

On the other hand, the Court lacks sufficient evidence to find that the first and third categories of requested evidence would have been favorable to plaintiff.  Plaintiff asks this Court to conclude that the missing staff records would show staff vacancies, inadequate training, and incidents of malfeasance, and that population counts and security logs would likewise show various deficiencies around the time of Micheli's escape.  But plaintiff only speculates in this regard.  Indeed, plaintiff's discussion of the "relevance" prong primarily recaps how the lost evidence bears upon her claims.  See Mot. at 5–6.  This conflates the first and third prongs of the Mazloum test: for sanctions to be awarded, plaintiff must show favorability, not just threshold relevance.  See Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 77 (S.D.N.Y. 1991) ("Where, as here, there is no extrinsic evidence whatever tending to show that the destroyed evidence would have been unfavorable to the spoliator, no adverse inference is appropriate."); Concord Boat Corp. v. Brunswick Corp., 1997 WL 33352759, at *7 (E.D. Ark. 1997) ("It would simply be inappropriate to give an adverse inference instruction based upon speculation that deleted e-mails would be unfavorable to Defendant's case.").  The favorability showing typically requires at least some extrinsic evidence, such as deposition or trial testimony or other such documentation, about the contents of the lost materials.  See Beck, 2012 WL 10817176, at *6 (finding third prong Mazloum satisfied based on declarations by two students that defendant "misled them" via email, "suggest[ing] that there may have been other such students" who were misled and that relevant "conversations with those other students would be found in [defendant's] email archives," which were lost); Ashraf-Hassan v. Embassy of France in the United States, 130 F. Supp. 3d 337, 342 (D.D.C. 2015) (discussing how trial testimony that plaintiff failed to complain to her sister about discrimination would lend support for a finding under Mazloum that plaintiff's deleted emails to her sister did not mention discrimination and thus were favorable to defendant).

To be sure, relevance may also "be inferred if the spoliator is shown to have a sufficiently culpable state of mind . . . on the theory that a culpable spoliator may have something to hide." Mahaffey, 898 F. Supp. 2d at 62 (alteration in original) (quoting Chen, 839 F. Supp. at 15).  But although bad faith alone is "sufficient circumstantial evidence from which a reasonable fact finder could conclude the missing evidence was unfavorable to [the spoliator]," a "showing of gross negligence in the destruction . . . of evidence" will only support such an inference "in some circumstances."  See Residential Funding Corp., 306 F.3d at 109.  Plaintiff has not asked this Court to infer unfavorability from Hope Village's state of mind, nor is such an inference warranted on the present record.  The context of the alleged spoliation—a large-scale effort to discard files at the time of the facility's closure—is not indicative of an effort to hide specific evidence from plaintiff in this lawsuit.  And while the Court is troubled by some of Hope Village's haphazard and seemingly arbitrary retention decisions, the Court lacks adequate information to infer from this behavior that Hope Village was destroying unfavorable documents while preserving less damning evidence.

In sum, on the current record, the Court finds that a reasonable jury could only infer that the second category of requested documents—detailing escape and abscondsion incidents at Hope Village—would have been favorable to plaintiff.  Even a "very slight showing" regarding the favorability of the first and third categories of requested documents has not been made.  See Shealayno'sun, 2021 WL 39620, at *8.

## D.  Additional Considerations

Because the "choice of an appropriate sanction is necessarily a highly fact-based determination based on the course of the discovery process," Bonds v. Dist. of Columbia, 93 F.3d 801, 804 (D.C. Cir. 1996), and there is a "strong presumption in favor of adjudications on the

merits," Shepherd, 62 F.3d at 1475, an adverse inference instruction may not be appropriate every time the Mazloum test is satisfied.  Rather, when evaluating the propriety of such an instruction, a court considers "the importance of the evidence involved, the importance of the evidence lost to the issues at hand, and the availability of other proof enabling the party deprived of the evidence to make the same point."  More v. Snow, 480 F. Supp. 2d 257, 274 (D.D.C. 2007) (citation omitted); accord Chen, 839 F. Supp. 2d at 15.

Although discovery in this case has just closed, when plaintiff filed the instant motion and the matter was briefed, the process was still very much ongoing; depositions, for instance, had not begun, and several subpoenas for documents remained outstanding.  Hence, even though plaintiff has satisfied the elements of the Mazloum test with respect to the missing escape and absconsion forms, the Court finds that awarding an adverse inference instruction would be premature on the current record.  Likewise, even if plaintiff had established the favorability of the other categories of requested documents, the Court would also decline to determine now whether an instruction regarding that evidence is proper.  A few considerations inform this approach.

For one, it is difficult for the Court to assess how important many of the missing records are to plaintiff's claims.  The breadth of plaintiff's complaint—in terms of Hope Village's failures—is substantial, and the Court has not been informed about how discovery may have narrowed the theories under which plaintiff wishes to proceed.  See Am. Compl. ¶¶ 68, 69, 77 (enumerating twenty-six duties of care that Hope Village violated as a basis for negligence and negligent training claims).  Furthermore, with respect to the requested staff records and population counts, plaintiff has received some materials from Hope Village and DOC.  See Req. for Produc. Resps. ¶ 17; DOC Production.  And without an understanding of how the produced materials differ from the missing ones, the Court cannot evaluate how "important" the latter are to plaintiff's case.

To be sure, the Court does not accept Hope Village's argument that plaintiff has now "abandoned" certain allegations in her complaint simply because plaintiff's expert did not opine of those allegations in her report.  See Opp'n at 3.  That argument lacks both factual and legal support.[9]  But a clearer picture of how plaintiff's case has developed through discovery, what theories she continues to pursue, what materials she has received, and what facts Hope Village does not dispute is necessary to enable the Court to analyze how central the lost evidence is to this lawsuit.  Cf. Clarke v. Wash. Metro. Area Transit Auth., 904 F. Supp. 2d 11, 21 (D.D.C. 2012) (declining to award sanctions when destroyed evidence merely confirmed a fact that the parties agreed upon); Gaither, 2013 WL 12320339, at *4 (denying request for adverse inference instruction without prejudice where plaintiff had "failed to demonstrate that there [was] an absence of other evidence to support her claims" or to "prove her arguments").

Hope Village's opposition to plaintiff's motion also suggests that some of the lost evidence may still be available from other sources.  Although Hope Village at times proposes implausible substitutes for this evidence,[10] the general point has some merit.  Cf. Clarke, 904 F. Supp. 2d at 21 (concluding sanctions were unwarranted when destroyed evidence "would have been cumulative at best").  For instance, Hope Village argues that plaintiff can derive "[c]omparable information" to that included in the missing security logs "from the SARs report" produced by Hope Village.

---

[9] Hope Village argues that plaintiff has not actually been prejudiced by the lost escape and abscondence forms because plaintiff's expert report, filed March 1, 2021, evinces that she has abandoned any "pattern or practice" claim.  Opp'n at 3, 11.  This argument is unpersuasive.  A party's expert cannot "waive" claims that are properly pled in the complaint.  Moreover, whether Hope Village had a pattern or practice of admitting and failing to properly supervise residents with concerning mental health evaluations could be relevant to the expert's conclusions.

[10] The Court is particularly unpersuaded by Hope Village's claim that data containing the raw "number of escapes/abscondences from Hope Village from 2013-2018" is a substitute for the forms that detail "the specific circumstances of each escape or abscondence" from the facility.  See Opp'n at 5–6; see also Reply at 3 ("Aggregate escape data compiled by Plaintiffs' pursuit of this information from the D.C. Department of Corrections is not a substitute for the narratives describing each event, identification of the individuals involved, the admitted system failures leading to the escape, and the similarity with the circumstances that caused Joel Paavola's murder.").

Req. for Produc. Resps. ¶ 21.  Hope Village also indicates that missing staff vacancy information "may be obtained from [DOC]." Id. ¶ 13.  Meanwhile, plaintiff has already received some training and employee records from Hope Village and some population count reports from DOC.  And although it seems unlikely that the escape and abscorsion forms are accessible through a third party, that possibility has not been ruled out by the parties' briefs.  Hence, because the Court lacks clarity on what specific documents plaintiff was able—or may be able—to obtain either from Hope Village or other entities through discovery, the Court cannot make a reasoned judgment about "the availability of other proof enabling [plaintiff] to make the same point." More, 480 F. Supp. 2d at 275.

Ultimately, then, the Court does not have sufficient information at this juncture to "properly calibrate the scales" to ensure that the "sanction corresponds to the misconduct." Shepherd, 62 F.3d at 1479.  However, because "the Court believes that a [more fully] developed record . . . could potentially provide plaintiff with the support necessary to warrant an adverse inference instruction—the Court will deny plaintiff['s] request without prejudice" at this time. Bolger, 608 F. Supp. 2d at 33.  Should plaintiff wish to renew her motion, she must make at least a "very slight showing" as to the "relevance"—i.e., favorability—of the first and third categories of records at issue. See Shealayno'sun, 2021 WL 39620, at *8.  And she must also provide a factual basis for the Court to discern whether any of the three categories of lost evidence are cumulative of other materials received in discovery and how important the lost evidence is to the claims she anticipates advancing at trial.

## II.     Costs and Attorneys' Fees

Plaintiff also requests "costs and attorneys' fees associated with seeking and obtaining documents from DOC to supplement the documents Hope Village destroyed, and with bringing

this motion." See Mot. at 7–8.  Because the Court has not yet awarded plaintiff any relief and the Court expects that plaintiff will renew (and expand) her request for an adverse inference instruction, the Court will wait to resolve plaintiff's request for costs and attorneys' fees until that time.

The Court finds this approach particularly prudent because plaintiff's reply brief makes no specific argument about attorneys' fees or costs, nor does it address Hope Village's principal arguments on the issue.  See Opp'n at 11 (arguing that "[a] finding of 'bad faith' is required to impose punitive sanctions" and that "reimbursement of attorney's fees and costs" related to a third-party subpoena is not warranted where plaintiff issued the subpoena before learning about Hope Village's spoliation).  Resolving plaintiff's request now would also be premature because the Court does not know the scope of plaintiff's efforts to recover missing records from third parties or whether Hope Village has made any attempts during discovery to locate the files that it returned to its customer agencies.  See D'Onofrio, 2010 WL 3324964, at *9.  Indeed, the Court lacks any estimation of the fees and costs that plaintiff seeks.

Hence, plaintiff's request for costs and attorneys' fees will likewise be denied without prejudice at this time.

## Conclusion

In sum, the Court finds that Hope Village was grossly negligent in destroying three categories of documents that it had a duty to preserve in this litigation: staff records, including staff vacancy information for the period when Micheli resided at Hope Village, training records, and personnel files; forms documenting escapes and absconsions from Hope Village in the year preceding Micheli's escape; and population counts, daily count sheets, and security logbooks for the period surrounding his escape.  However, because plaintiff has only established to date that the

20

lost escape and absconsion forms would be favorable to her, and because the Court lacks sufficient information about the importance of all three categories of records to plaintiff's case, the Court will decline to award any adverse inference instruction at this time.  Given that the parties are continuing to litigate spoilation issues in this case and some key issues have been unaddressed by plaintiff's brief, the Court will also deny without prejudice plaintiff's request for attorneys' fees and costs.  A separate Order will issue on this date.


                                                        /s/
                                              JOHN D. BATES
                                          United States District Judge

Dated: September 4, 2021